**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CLINMICRO IMMUNOLOGY CENTER, LLC, | CIVIL ACTION NO. 3:CV-11-02213 |
| Plaintiff, | |
| v. | (JUDGE CAPUTO) |
| PRIMEMED, P.C., and JOAN SALIJKO, | |
| Defendants. | |

## **MEMORANDUM**

Presently before the Court is Defendants PrimeMed, P.C. ("PrimeMed") and Joan Salijko's ("Salijko") Motion to Dismiss Plaintiff ClinMicro Immunology Center, LLC's ("ClinMicro") First Amended Complaint. (Doc. 30.) I previously dismissed, without prejudice, ClinMicro's tortious interference with contracts claims. (Docs. 25; 26.) ClinMicro subsequently filed the First Amended Complaint to cure the deficient tortious interference allegations. (Doc. 27.) Defendants have again moved for dismissal of these claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because the tortious interference with contracts claims now adequately state claims upon which relief can be granted, Defendants' motion to dismiss will be denied.

### **I. Background**

The facts as set forth in the First Amended Complaint are as follows:

ClinMicro is an indepedent clinical microbiology and immunology center with expertise in the development, management, administration, and supervision of clinical reference laboratory businesses for medical service providers. (*First Am. Compl.*, ¶ 2.) PrimeMed is a licensed medical service provider engaged in the business of providing clinical laboratory services to its patients and to referring providers. (*Id*. at ¶ 4.)

Beginning on or about April 3, 2006, Salijko became employed with ClinMicro as a laboratory manager. (*Id*. at ¶ 6.) Salijko had multiple responsibilities for ClinMicro, including administering, coordinating, and informing the director of ClinMicro about the technical

activities of the company. (*Id*.) In connection with her employment with ClinMicro, Salijko executed a Confidentiality Agreement, a Security Policy Agreement, and a supplemental Confidentiality and Non-Disclosure Agreement (collectively the "Confidentiality Agreement"). (*Id*. at ¶ 7.)

In or about August 2007, PrimeMed entered into discussions with ClinMicro to induce ClinMicro to build a clinical laboratory for PrimeMed. (*Id*. at ¶ 13.) After ClinMicro formulated the plan for development and operation of the laboratory, PrimeMed requested ClinMicro to relocate its business operations to the same facilities occupied by PrimeMed. (*Id*. at ¶ 14.) To facilitate the relocation, PrimeMed effectively loaned money to ClinMicro. (*Id*. at ¶ 15.) The loan was used to pay the expenses associated with ClinMicro's required fit-out and renovation of the premises so that it could be located at the same facility as PrimeMed. (*Id*.) The relocation ultimately occurred in or about January 2009. (*Id*.)

After the relocation, ClinMicro began constructing the clinical laboratory it had previously developed for PrimeMed. (*Id*. at ¶ 16.) The new laboratory received state approval to begin operations in or about March 2009. (*Id.*) In addition to building the new laboratory, PrimeMed also wanted ClinMicro to provide day-to-day management and technical services to the laboratory. (*Id*. at ¶ 17.)

In or about March 2009, well after the original discussions between the parties commenced, and after considerable services had been rendered to PrimeMed by ClinMicro, PrimeMed prepared and provided to ClinMicro proposed agreements intending to memorialize the parties' pre-existing and continuing business relationship. (*Id*. at ¶ 18.) These agreements included: (1) a Laboratory Management Agreement ("LMA"); (2) a Reference Laboratory Services Agreement ("LSA"); (3) a Sublease Agreement; and (4) a Promissory Note. (*Id*.) With respect to the LMA, the parties disputed the amount that PrimeMed was obligated to pay to ClinMicro for "Development Services" for the development of the clinical laboratory. (*Id*. at ¶ 19.) As a result, ClinMicro replaced the original Section 4.3 of the LMA with an Addendum that provided for a specific procedure by which the amount owed to ClinMicro for development services would be determined.

PrimeMed, however, did not execute the modified LMA or provide a further modified version of the LMA. (*Id*. at ¶¶ 19-20.) As such, ClinMicro never executed the Promissory Note. (*Id*. at ¶ 20.) Despite the disputes over these documents, the parties proceeded with their relationship and continued conducting business substantially in accordance with the terms of the LMA, the LSA, and the Sublease. (*Id*. at ¶ 21.)

Pursuant to the terms of the LSA, PrimeMed continued to refer to ClinMicro all laboratory service work as identified in the LSA. (*Id*. at ¶ 22.) Such work included a substantial number of "Vitamin-D Tests." (*Id*.) These tests were performed in a distinct and specialized manner by ClinMicro, provided substantial laboratory services and marketability to PrimeMed, and produced substantial profit for both parties. (*Id*.)

With respect to the laboratory operations provided to PrimeMed by ClinMicro, Salijko served as their laboratory manager. (*Id*. at ¶ 24.)

In or about June 2011, ClinMicro's main lab management computer went missing from its administrative office. (*Id*. at ¶ 26.) The computer contained ClinMicro's lab management software, Orchard, which is a pathology information system designed to handle the clinical, molecular, cytology, and pathology testing, reporting and billing functions of ClinMicro. (*Id*.) The computer was designed to run the Orchard software to analyze, interface with, store, and transmit prescriber data, patient data, cost data, and test data to and from the publisher's host computer. (*Id*.)

The computer was later learned to have been removed from ClinMicro by Salijko, who had taken the computer to PrimeMed so that certain business data and records could be removed and copied. (*Id*. at ¶ 27.) Once the computer was returned to ClinMicro, however, its functionality was limited, as business, provider, patient, and e-mail data had all been removed from the computer. (*Id*. at ¶ 28.) At the time the computer was taken by Salijko to PrimeMed, neither party had authorization to remove or delete any data or information stored on the computer. (*Id*. at ¶ 29.)

Thereafter, on or about June 13, 2011, PrimeMed sought to conclude certain aspects of the parties relationship. (*Id*. at ¶ 31.) In particular, PrimeMed sought to immediately

3

terminate the LMA despite a provision in the agreement requiring at least ninety (90) days notice of intent to terminate prior to the expiration of the existing contractual term. (*Id*.)

Two days later, on June 15, 2011, Solijko resigned her position with ClinMicro and accepted an offer of employment with PrimeMed in substantially the same capacity as her employment with ClinMicro. (*Id*. at ¶ 33)  In addition to Salijko, eight (8) other ClinMicro employees were lured to work for PrimeMed in or about June 2011. (*Id*. at ¶ 34.) PrimeMed's solicitation of ClinMicro's employees occurred despite a restriction against such conduct in the LMA. (*Id*. at ¶ 35.)  And, after luring these employees from ClinMicro, PrimeMed ceased referring Vitamin-D Tests to ClinMicro, and instead began subcontracting those tests to an unrelated third-party. (*Id*. at ¶ 36.)  PrimeMed also ceased reimbursing ClinMicro for the removal of laboratory waste at that time. (*Id*. at ¶ 37.)

As a result of these events, ClinMicro commenced this action against PrimeMed and Salijko on November 29, 2011, asserting a federal law claim against Defendants for violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq*., and a number of supplemental state law claims. (Doc. 1.)  PrimeMed subsequently sought dismissal of a number of the state law claims in January 2012. (Doc. 10.)

On July 23, 2012, PrimeMed and Salijko's motion to dismiss was granted in part and denied in part. (Docs. 25; 26.)  In particular, the motion to dismiss was granted with respect to the fraudulent inducement and the duty of good faith and fair dealing claims, and the claims were dismissed with prejudice.  The motion to dismiss the tortious interference with contracts claims was also granted, and the claims were dismissed without prejudice. PrimeMed's motion to dismiss was denied in all other respects.

ClinMicro subsequently amended the tortious interference with contracts claims.  In response, Defendants again moved to dismiss the claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 30.)  Now, as the motion to dismiss has been fully briefed, it is ripe for disposition.

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint,

in whole or in part, for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in support of their claims. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000). The Court does not consider whether a plaintiff will ultimately prevail. *See id*. A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). The statement required by Rule 8(a)(2) must give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Detailed factual allegations are not required. *Twombly*, 550 U.S. at 555. However, mere conclusory statements will not do; "a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Instead, a complaint must "show" this entitlement by alleging sufficient facts. *Id*. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009). As such, "[t]he touchstone of the pleading standard is plausability." *Bistrian v. Levi*, - - - F.3d - - - , 2012 WL 4335958, at *8 (3d Cir. Sept. 24, 2012).

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible

on its face," *Twombly*, 550 U.S. at 570, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1949.

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *Id*. The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions.'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997)).

### III. Discussion

As stated, Defendants seek dismissal of ClinMicro's tortious interference with contracts claims against PrimeMed (Count VI) and Salijko (Count VII).

The elements of a tortious interference with existing contractual relations claim under Pennsylvania law are:

> (1) that there be an existing contractual relationship between the plaintiff and a third party; (2) that the defendant purposely or intentionally interfered with the performance of that contract by inducing a breach or otherwise causing the third party not to perform; (3) that the defendant was not privileged to act in this manner; and (4) that the plaintiff suffered pecuniary loss as a result of the breach of contract.

*Fishkin v. Susquehanna Partners, G.P.*, 563 F. Supp. 2d 547, 586 (E.D. Pa. 2008) (citing

*Remick v. Manfredy*, 238 F.3d 248, 263 (3d Cir. 2001)). Tortious interference with contracts claims rest on a contractual relationship between the plaintiff and a "third person." *See Daniel Adams Assoc., Inc. v. Rimbach Publ'g, Inc.*, 519 A.2d 997, 1000 (Pa. Super. 1987) (citing *Glenn v. Point Park Coll.*, 441 Pa. 474, 479, 272 A.2d 895, 898 (1971); *Raab v. Keystone Ins. Co.*, 271 Pa. Super. 185, 189, 412 A.2d 638, 640 (Pa. Super. 1980)). However, "[t]he mere existence of a contractual relationship between two parties does not preclude one from bringing a tort claim against the other." *Med. Mktg. Consultants, LLC v. Cardiac Telecom Corp.*, No. 06-0274, 2007 WL 1811155, at *2 (W.D. Pa. May 31, 2007) (citing *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 (3d Cir. 2001)). Instead, Pennsylvania law requires "that the tort claim not be a mere restatement of the contract claim; it must be a separate and independent action capable of standing alone." *Id.* (citing *Kalumetals, Inc. v. Hitachi Magnetics Corp.*, 21 F. Supp. 2d 510 (W.D. Pa. 1998)). If the tort claim is not separate and independent of the contract claim, the claim is barred by the gist-of-the-action doctrine. *See, e.g., Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 621 (E.D. Pa. 2010) (quoting *Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp. 2d 491, 505 (E.D. Pa. 2008)).

In seeking dismissal, PrimeMed argues that: (1) ClinMicro fails to allege specific conduct constituting actionable interference; (2) ClinMicro fails to allege the necessary elements of knowledge and intent; and (3) the claim is barred by the gist-of-the-action doctrine. Thus, PrimeMed contends that the claim should be dismissed. PrimeMed's arguments are unpersuasive.

First, ClinMicro sufficiently pleads wrongful conduct by PrimeMed that allegedly interfered with ClinMicro's contractual relationships with Salijko. Specifically, ClinMicro claims PrimeMed "encourag[ed], facilitat[ed], and abett[ed] JS to obtain and distribute to PrimeMed the confidential and other proprietary information of ClinMicro (including, without limitation, JS's collecting and distributing the aforesaid information relating to the profitable Vitamin-D Tests referred to ClinMicro) to be used by PrimeMed." (*First Am. Compl.*, ¶ 65.)

Second, the First Amended Complaint adequately alleges that PrimeMed had knowledge of Salijko's contractual relationships with ClinMicro. In particular, ClinMicro claims that PrimeMed had "actual knowledge" of its contractual relationships with Salijko, which consisted of a Confidentiality Agreement, a supplemental Confidentiality and Non-Disclosure Agreement, and a Security Policy Agreement. (*Id*. at ¶¶ 6-7, 64.)

Lastly, the tortious interference with contracts claim against PrimeMed will not be dismissed pursuant to the gist-of-the-action doctrine. As noted, a tortious interference with contract claim that coincides directly and solely with a contractual prohibition on the identical activity will fall within the gist-of-the-action doctrine. *See Brown & Brown*, 745 F.Supp.2d at 621–22. Essentially, the gist-of-the-action doctrine distinguishes claims sounding in contract from those sounding in tort by determining the source of the duties allegedly breached. *See Med. Mktg. Consultants*, 2007 WL 1811155, at *2 (citing *American Guar. & Liab. Ins. Co. v. Fojanini*, 90 F. Supp. 2d 615, 622 (E.D. Pa. 2000)). Thus, the doctrine bars tort claims: "1) arising solely from a contract between the parties; 2) where the duties allegedly breached were created and grounded in the contract itself; 3) where the liability stems from a contract; or 4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." *Hart v. Arnold*, 884 A.2d 316, 339-40 (Pa. Super. 2005) (citations omitted).

Here, contrary to PrimeMed's assertions, the alleged tortious conduct with respect to the claim in Count VI is unrelated to the ClinMicro/PrimeMed contractual relationship. Rather, PrimeMed's alleged tortious conduct interfered with ClinMicro's contractual agreements with Salijko, as PrimeMed allegedly encouraged Salijko to breach the terms of her Confidentiality Agreements. And, while the LMA prohibits PrimeMed from soliciting ClinMicro's employees, and such claims would thus be barred by the gist-of-the-action doctrine, the LMA does not address the encouragement or facilitation of an employee to distribute confidential and proprietary information. *See, e.g., Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 WL 4205476, at *10 (E.D. Pa. Sept. 19, 2012) (denying motion to dismiss tortious interference claim, in part, because the non-competition agreement

8

between the plaintiff and the defendant did not preclude the defendant from dealing with the plaintiff's vendors). As such, ClinMicro would have a tortious interference with the Confidentiality Agreements claim even if it had never contracted with PrimeMed. *See, e.g., Medical Mktg. Consultants*, 2007 WL 1811155, at *2 ("MMC would have a claim for tortious interference with the brokerage agreements relationship even if it had never contracted with CTC."). Moreover, since "'[c]aution must be exercised in dismissing a tort action on a motion to dismiss because whether tort and contract claims are separate and distinct can be a factually intensive inquiry,'" *Synthes, Inc.*, 2012 WL 4205476, at *11 (quoting *Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc.*, No. 11–4568, 2011 WL 6046923, at *8 (E.D. Pa. Dec. 6, 2011)), the motion to dismiss Count VI will be denied.

As to the tortious interference claim against Salijko, she argues that the claim should be dismissed because: (1) ClinMicro fails to allege any acts by her that caused or induced the actions taken by PrimeMed; and (2) as a PrimeMed employee, she could not be liable for interfering with her employer's agreements. Because ClinMicro sufficiently pleads all necessary elements of the claim, Salijko's motion to dismiss Count VII will be denied.

Here, ClinMicro alleges that Salijko had actual knowledge of the ClinMicro/PrimeMed contractual relationship, (*First Am. Compl.*, ¶ 72), that she was not privileged to interfere with the parties' contractual relationship, (*Id*. at ¶ 74), and that ClinMicro suffered pecuniary loss due to PrimeMed's breach of contract. (*Id*. at ¶ 75.) Furthermore, ClinMicro alleges that, as a result of Salijko's conduct, PrimeMed was induced and/or caused "to refrain from referring Vitamin-D Tests to ClinMicro as provided under the LSA" and "to [dis]continue its contractual relationship with ClinMicro." (*Id*. at ¶ 73.) And, despite Salijko's argument that even if she caused PrimeMed to cease sending Vitamin-D Tests to ClinMicro, she cannot be liable for interfering with ClinMicro's contractual relationship with PrimeMed while she was a PrimeMed employee, the allegedly interfering conduct occurred "between the time of her employment with ClinMicro and prior to her employment with PrimeMed." (*Id*.) Thus, Salijko's wrongful acts, as alleged, were not during her employment with PrimeMed. Accordingly, as the tortious interference with contracts claim against Salijko is plausible on

its face, ClinMicro will be permitted to proceed with the claim.

## IV. Conclusion

For the above stated reasons, Defendants' motion to dismiss will be denied.

An appropriate order follows.

 December 14, 2012                                          /s/ A. Richard Caputo
Date                                                                  A. Richard Caputo
                                                                          United States District Judge