# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLINMICRO IMMUNOLOGY CENTER, LLC, | CIVIL ACTION NO. 3:CV-11-2213 |
| Plaintiff, | (JUDGE CAPUTO) |
| v. | |
| PRIMEMED, P.C. and JOAN SALIJKO, | |
| Defendants. | |

---

PRIMEMED, P.C.,

    Counterclaim and Additional-Party Plaintiff,

    v.

CLINMICRO IMMUNOLOGY CENTER, LLC and HASAN NAMDARI,

    Counterclaim and Additional-Party Defendants.

## **MEMORANDUM**

Presently before the Court are the motion to dismiss PrimeMed, P.C.'s ("PrimeMed") counterclaims (Doc. 57) filed by Counterclaim Defendant ClinMicro Immunology Center, LLC ("ClinMicro") and the motion to dismiss PrimeMed's additional party claims (Doc. 58) filed by Additional-Party Defendant Dr. Hasan Namdari ("Dr. Namdari"). For the reasons that follow, the motions to dismiss will be granted in part and denied in part.

## I. Background

**A.    Factual Background**

PrimeMed alleges the following:

After PrimeMed was formed in 1998, it built and staffed a radiology imaging center, a nuclear imaging center, and a physical therapy center in the Scranton region. (Doc. 52,

*Countercl.*, ¶ 6.) In 2004, PrimeMed opened a radiation oncology center for cancer treatment, which has since been sold. (*Id*.) By 2006, PrimeMed had an extensive network of physicians and other healthcare providers who referred patients to PrimeMed's facilities. (*Id*. at ¶ 7.) PrimeMed also handled the collection of samples for medical testing, which it referred out to various laboratories. (*Id*.)

ClinMicro was formed in 2006. (*Id*. at ¶ 8.) ClinMicro provides microbiology and immunology reference laboratory services, but apart from its laboratory itself, Clinmicro has no collection centers, no phlebotomists, and no infrastructure for collecting samples for testing. (*Id*.)

In or about 2007, PrimeMed sought to expand its medical services to include laboratory testing. (*Id*. at ¶ 9.) PrimeMed contacted Dr. Namdari of ClinMicro. Ultimately, a series of agreements were entered into, effective March 1, 2009. (*Id*.) Pursuant to these agreements, ClinMicro would relocate its microbiology laboratory to a facility leased by PrimeMed, consult in the design, staffing, and operation, at PrimeMed's expense, of a clinical laboratory for PrimeMed, and manage for a fee and staff PrimeMed's clinical laboratory. (*Id*.) The parties' rights and obligations were set forth in the Laboratory Management Agreement ("LMA"). Because ClinMicro did not have the funds necessary to build or equip its new laboratory, PrimeMed advanced the money to ClinMicro. (*Id*. at ¶¶ 11-12.) This money was repaid reluctantly and tardily by ClinMicro, and ClinMicro refused to make payments on a promissory note for two years despite enjoying the use of the laboratory constructed with PrimeMed's money. (*Id*. at ¶ 12.)

Under a separate Reference Laboratory Service Agreement ("LSA"), ClinMicro agreed to accept referrals from and perform microbiology/immunology tests for PrimeMed. (*Id*. at ¶ 13.) There was not, however, an agreement to which ClinMicro would refer clinical tests to PrimeMed's laboratory. (*Id*. at ¶ 14.) PrimeMed did not make any money on tests

it referred to ClinMicro under the LSA. (*Id*. at ¶ 15.)  Instead, ClinMicro billed the patients' insurance directly and retained all of the proceeds. (*Id*.)

The parties' relationship soured shortly after its inception. (*Id*. at ¶ 18.)  ClinMicro failed to pay rent under its sublease, failed to reimburse PrimeMed for equipment purchased for it, and failed to repay the loan made by PrimeMed. (*Id*. at ¶ 19.)  ClinMicro claimed that payments were not made as a result of unresolved issues relating to the development fee provided for in the LMA. (*Id*. at ¶ 20.)   ClinMicro and Dr. Namdari attempted to surreptitiously insert an Addendum to the LMA which had never been agreed to or discussed with PrimeMed. (*Id*. at ¶ 21.)

In the Spring of 2009, Dr. Namdari, in his position as Medical Director of PrimeMed and employer of PrimeMed's lab manager, took action to his own benefit at PrimeMed's expense with regard to the profitable Vitamin D testing. (*Id*. at ¶ 25.)  When the PrimeMed laboratory began operating, ClinMicro was not performing Vitamin D tests. (*Id*. at ¶ 27.)  At the time PrimeMed commenced operations, Dr. Namdari and ClinMicro obtained pricing from Quest for referral of Vitamin D tests and other tests that ClinMicro and PrimeMed were not performing. (*Id*. at ¶ 28.)  Dr. Namdari learned that Quest's price for Vitamin D testing when compared with the much higher insurance reimbursement rate made those tests quite profitable. (*Id*. at ¶¶ 29-30.)   Dr. Namdari instructed Joan Salijko ("Salijko"), the lab manager, to refer Vitamin D tests to ClinMicro. (*Id*. at ¶¶ 31-32.)  Vitamin D tests, however, are classified as chemistry tests and not microbiology tests. (*Id*. at ¶ 33.)  When ClinMicro first began doing chemistry tests, it was not licensed to perform such tests. (*Id*. at ¶ 36.)

ClinMicro and Dr. Namdari never informed PrimeMed that the Vitamin D tests directed to ClinMicro were actually chemistry tests. (*Id*. at ¶ 39.)  Nor did ClinMicro and Dr. Namdari advise PrimeMed that ClinMicro was not licensed to do Vitamin D testing. (*Id*. at ¶ 40.)

3

**B.    Procedural History**

ClinMicro commenced this action on November 29, 2011 against PrimeMed and Salijko asserting a federal law claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq*., and a number of supplemental state law claims. (Doc. 1.) PrimeMed subsequently sought dismissal of a number of the state law claims in January 2012. (Doc. 10.) The motion to dismiss was granted in part and denied in part. In particular, the motion to dismiss was granted with respect to the fraudulent inducement and the duty of good faith and fair dealing claims, and the claims were dismissed with prejudice. The motion to dismiss the tortious interference with contracts claims was also granted, and the claims were dismissed without prejudice. PrimeMed's motion to dismiss was denied in all other respects.

On August 8, 2012, ClinMicro filed an Amended Complaint. PrimeMed and Salijko moved to dismiss the tortious interference claims. The motion to dismiss was denied, and Defendants were ordered to file an answer to ClinMicro's Amended Complaint.

On January 9, 2013, PrimeMed and Salijko filed their Answer and Affirmative Defenses to the Amended Complaint. On that date, PrimeMed also filed counterclaims against ClinMicro and additional party claims against Dr. Namdari. PrimeMed asserts the following claims: Fraud (First Claim); Negligent Misrepresentation and Non-Disclosure (Second Claim); Misappropriation (Third Claim); Breach of Trust/Fiduciary Duty (Fourth Claim); Tortious Interference (Fifth Claim); Breach of Covenant of Good Faith and Fair Dealing (Sixth Claim); and Unjust Enrichment (Seventh Claim). All claims except the Sixth Claim, which is set forth against ClinMicro only, are asserted against both ClinMicro and Dr. Namdari. On March 11, 2013, ClinMicro and Dr. Namdari moved to dismiss PrimeMed's counterclaims and additional party claims. Now, the motions to dismiss are fully briefed and ripe for disposition.

## II. Legal Standard

"Courts use the same standard in ruling on a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) as they do for a complaint." *PPG Indus., Inc. v. Generon IGS, Inc.*, 760 F. Supp. 2d 520, 524 (W.D. Pa. 2011) (citing *United States v. Union Gas Co.*, 743 F. Supp. 1144, 1150 (E.D. Pa. 1990)).

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a counterclaim plaintiff's claims, in whole or in part, for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court's role is limited to determining if a counterclaim plaintiff is entitled to offer evidence in support of their claims. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000). The Court does not consider whether a counterclaim plaintiff will ultimately prevail. *See id*. A counterclaim defendant bears the burden of establishing that a counterclaim fails to state a claim. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The statement required by Rule 8(a)(2) must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Detailed factual allegations are not required. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. However, mere conclusory statements will not do; "a [counterclaim] must do more than allege the [counterclaim] plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Instead, a counterclaim must "show" this entitlement by alleging sufficient facts. *Id*. "While legal conclusions can provide the framework of a [counterclaim], they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950,

5

173 L. Ed. 2d 868 (2009). As such, "[t]he touchstone of the pleading standard is plausability." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the [counterclaim] to strike conclusory allegations, and then (3) looking at the well-pleaded components of the [counterclaim] and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the counterclaim, a counterclaim plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679, 129 S. Ct. 1937.

In deciding a motion to dismiss, the Court should consider the allegations in the counterclaim, exhibits attached to the counterclaim, and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The Court may also consider "undisputedly authentic" documents when the counterclaim plaintiff's claims are based on the documents and the counterclaim defendant has attached copies of the documents to the motion to dismiss. *Id.* The Court need not assume the counterclaim plaintiff can prove facts that were not alleged in the counterclaim, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or

credit a counterclaim's "'bald assertions'" or "'legal conclusions.'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997)).

## III. Discussion

ClinMicro and Dr. Namdari seek dismissal of PrimeMed's counterclaims and additional party claims in their entirety. The motions to dismiss will be granted in part and denied in part for the reasons that follow.

### A. First Claim- Fraud

PrimeMed's first claim against ClinMicro and Dr. Namdari is for fraudulent misrepresentation and concealment. To state a claim of fraud under Pennsylvania law, a plaintiff must allege:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (Pa. 1994); *see also Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 560 (Pa. 1999). "The tort of intentional non-disclosure has the same elements as the tort of intentional misrepresentation except that in a case of intentional non-disclosure the party intentionally conceals a material fact rather than making an affirmative misrepresentation." *Gibbs*, 647 A.2d at 889 n.12; *see also Boortz*, 729 A.2d at 560.

ClinMicro and Dr. Namdari contend that PrimeMed's fraud claim is barred by the gist of the action doctrine and the economic loss doctrine. The gist of the action doctrine "'maintain[s] the conceptual distinction between breach of contract and tort claims[,]' and precludes plaintiffs from recasting ordinary breach of contract claims as tort claims." *McShea v. City of Phila.*, 606 Pa. 88, 995 A.2d 334, 339 (Pa. 2010) (quoting *eToll, Inc. v.*

7

*Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002)). The existence of a contractual relationship between two parties does not preclude one party from bringing a tort claim against the other. *Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 (3d Cir. 2001). However, if the tort claim is not separate and independent of the contract claim, the claim is barred by the gist-of-the-action doctrine. *See, e.g., Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 619 (E.D. Pa. 2010)

"When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort." *The Knit With v. Knitting Fever Inc.*, Nos. 08–4221, 08–4775, 2009 WL 3427054, at *5 (E.D. Pa. Oct. 20, 2009) (quoting *Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999)). This analysis requires consideration of the source of the duties allegedly breached. *The Knit With*, 2009 WL 3427054, at *5; *see also Weber Display & Packaging v. Providence Washington Ins. Co.*, No. 02–7792, 2003 WL 329141, at *3 (E.D. Pa. Feb. 10, 2003) ("The difference between tort and contract actions is noted by the fact that tort actions arise where a party breaches a duty imposed as a matter of social policy; whereas contract actions arise where a party breaches a duty imposed by mutual consensus between the parties."). "[I]f the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort." *The Knit With*, 2009 WL 3427054, at *5.

The doctrine precludes tort claims: "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of the contract." *eToll, Inc.*, 811 A.2d at 19 (internal citations and internal quotation

marks omitted).

With respect to their gist of the action doctrine argument, Dr. Namdari and ClinMicro maintain that to the extent that any duties or obligations were breached in this case, the duties or obligations arose from the parties' written agreements. Specifically, they assert that PrimeMed's allegations that they fraudulently concealed the nature of Vitamin D tests, ClinMicro's lack of licensure to perform Vitamin D tests, and the profitability of those tests if referred to Quest are inextricably intertwined with the terms of the LMA and the LSA. In opposition, PrimeMed argues that ClinMicro and Dr. Namdari fail to identify the contractual provision their allegedly deceptive conduct breached, and that it is premature at this stage in the litigation to determine that the gist of its claim sounds in contract and not tort.

PrimeMed's fraud claim will not be dismissed. Considering the gravamen of PrimeMed's allegations, it is not apparent at this stage of the litigation that the gist of the claim sounds in contract as opposed to tort. Significantly, although ClinMicro and Dr. Namdari contend that PrimeMed's fraud claim is predicated on contractual performance, it is not clear that the duties they allegedly breached were grounded in the parties' agreements. That is, while ClinMicro had a duty to manage PrimeMed's laboratory under the terms of the LMA, it is not evident at this time whether the alleged concealment of the nature of Vitamin D tests was intertwined with ClinMicro's obligations under the relevant agreements or merely collateral to its management of PrimeMed's laboratory. *See, e.g., Always in Service, Inc. v. Supermedia Services-East, Inc.*, No. 11-127, 2012 WL 717233, at *8 (E.D. Pa. Mar. 5, 2012) ("courts are hesitant to decide whether the gist of an action is in contract or tort at the motion to dismiss stage of a proceeding, without the benefit of a more developed factual record. ").

ClinMicro and Dr. Namdari also move to dismiss the fraud claim based on the economic loss doctrine. In general, the economic loss doctrine "prohibits plaintiffs from

9

recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995). Pennsylvania law "provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage." *Azur v. Chase Bank, USA, N.A.*, 601 F.3d 212, 222 (3d Cir. 2010) (quoting *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 175 (3d Cir. 2008)). "Although the Pennsylvania Supreme Court has not ruled on the issue, the Third Circuit has predicted that it would not create an exception to the economic loss doctrine for intentional torts." *Tubman v. USAA Cas. Inc. Co.*, - - - F. Supp. 2d - - -, 2013 WL 1809345, at *4 (E.D. Pa. Apr. 20, 2013) (citing *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680-81 (3d Cir. 2002). While the *Werwinski* court predicted that the Pennsylvania Supreme Court would not adopt a blanket exception to the economic loss doctrine for intentional fraud, it also noted with approval an "emerging trend" that "recognize[s] a limited exception to the economic loss doctrine for fraud claims, but only where the claims at issue arise independent[ly] of the underlying contract." *Werwinski*, 286 F.3d at 676 (quoting *Raytheon Co. v. McGraw–Edison Co., Inc.*, 979 F. Supp. 858, 870 (E.D. Wis. 1997)). Such an exception would allow a plaintiff to bring a fraud claim "only if the fraud is 'extraneous to the contract,' not 'interwoven with the breach of contract.'" *Id.* (quoting *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.*, 209 Mich. App. 365, 532 N.W.2d 541, 545 (1995)). Nevertheless, there remains a split among courts in Pennsylvania and the federal district courts regarding the applicability of the economic loss doctrine to intentional fraud claims. *See, e.g., Oldcastle Precast, Inc. v. VPMC, Ltd.*, No. 12-6270, 2013 WL 1952090, at *11 (E.D. Pa. May 13, 2013) (collecting cases).

For reasons similar to that denying the motion to dismiss the fraud claim based on the gist of the action doctrine, the fraud claim will not be dismissed on account of the

economic loss doctrine. It is not apparent that the fraud claim is "interwoven with the breach of contract." In that regard, while ClinMicro and Dr. Namdari argue that PrimeMed's only alleged loss is the benefit of the parties' bargained-for exchange, based solely on PrimeMed's allegations, it sufficiently asserts damages for deceptive conduct distinct from any potential breaches of the parties' contractual agreements. *See, e.g., Cave v. Saxon Mortg. Servs., Inc.*, No. 11-4586, 2012 WL 1957588, at *11 (E.D. Pa. May 30, 2012). Thus, I decline, at this time, to conclude that PrimeMed's fraud claim is barred by the economic loss doctrine.

**B.     Second Claim- Negligent Misrepresentation and Non-Disclosure**

PrimeMed's second claim against ClinMicro and Dr. Namdari is for negligent misrepresentation and non-disclosure. Under Pennsylvania law, a negligent misrepresentation claim has four elements: "1) a misrepresentation of a material fact; 2) made under circumstances in which the misrepresenter ought to have known its falsity; 3) with an intent to induce another to act on it; and 4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Smith v. Lincoln Ben. Life Co.*, 395F. App'x 821, 824 (3d Cir. 2010) (citing *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270 (2005)).

As with PrimeMed's fraud claim, ClinMicro and Dr. Namdari seek dismissal of the negligent misrepresentation claim based on the gist of the action doctrine and the economic loss doctrine. For the reasons previously detailed, it is not evident that these doctrines are applicable to the instant case. PrimeMed may proceed with its second claim.

**C.     Third Claim- Misappropriation of Corporate Opportunity**

PrimeMed's third claim asserts that Dr. Namdari and ClinMicro misappropriated a corporate opportunity by directing the Vitamin D tests to ClinMicro. The corporate opportunity doctrine "imposes liability on officers and directors who take personal advantage

of business opportunities when these opportunities fall within the 'scope of activities' of, and constitute a 'present or potential advantage' to, the corporation." *Levy and Surrick v. Surrick*, 362 Pa. Super. 510, 515, 524 A.2d 993, 995 (Pa. Super. Ct. 1987) (quoting *Seaboard Industries, Inc. v. Monaco*, 442 Pa. 256, 262, 276 A.2d 305, 309 (Pa. 1971)). The doctrine prohibits an officer or director from competing with the corporation in any fashion, even in areas outside the scope of the officer's or director's work for the corporation. *Id*. This duty is broader than that owed by an agent to its principal. *See id*. "The duty of the agent . . . extends only as far as the agency relationship itself. The agent can compete with his or her principal in 'matters not within the field of his agency.'" *Id*. (quoting Restatement (Second) of Agency § 934, cmt. a); *see also* Restatement (Third) of Agency § 8.04.

ClinMicro and Dr. Namdari seek dismissal of the claim based on the fact that they were not officials, directors, or even employees of PrimeMed. Thus, they surmise that no fiduciary duty was owed to PrimeMed under the terms of the LMA. In support, ClinMicro and Dr. Namdari rely on section 8.1 of the LMA, which provides:

> RELATIONSHIP OF THE PARTIES. CIC [ClinMicro] is and shall continue to be an independent contract for all services furnished pursuant to this agreement by CIC and its employees. CIC and its employees shall provide services hereunder free of any direction or control by PRIMEMED, in a manner consistent with current standards of laboratory management practice. This Agreement shall not expressly or by implication create any employer/employee, joint venture or partnership relationship between PRIMEMED and CIC or its employees.

(Doc. 52, Ex. 1, § 8.1.)

But, section 8.1 of the LMA, PrimeMed argues, does not preclude a finding that ClinMicro and Dr. Namdari acted as its agents in running its laboratory. In reply, ClinMicro and Dr. Namdari contend that PrimeMed has failed to allege specific facts showing that the parties were in a principal/agent relationship.

In Pennsylvania, there are three basic elements necessary to establish an agency relationship: (1) manifestation by a principal that an agent shall act for the principal; (2) the

12

agent's acceptance of the undertaking; and (3) the parties' understanding that the principal is to be in control of the undertaking. *CGB Occupational Therapy, Inc. v. RHA Health Serv., Inc.*, 357 F.3d 375, 385 n.11 (3d Cir. 2004) (quoting *Basile v. H & R Block Inc.*, 563 Pa. 359, 761 A.2d 1115, 1120 (Pa. 2000)). "An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent." *Cohen v. Salick Health Care, Inc.*, 772 F. Supp. 1521, 1528 (E.D. Pa. 1991) (quoting Restatement (Second) of Agency § 2(3)). Under Pennsylvania law, whether a party is an independent contractor or an agent depends on the relationship in the specific case, "and one may stand as both independent contractor and agent to another." *Tax Review Bd. v. Slater Sys., Inc.*, 398 Pa. 477, 482, 158 A.2d 561, 563 (Pa. 1960) (citing *Commonwealth v. Minds Coal Mining Corp.*, 360 Pa. 7, 60 A.2d 14 (Pa. 1948); Restatement (Second) of Agency § 2). "An independent contractor may be an agent or non-agent, but cannot be a servant, since 'servant' and 'independent contractor' are antithetical terms." *Kemether v. Pa. Interscholastic Athletic Ass'n, Inc.*, 15 F. Supp. 2d 740, 748 (E.D. Pa. 1998); *see also Cohen*, 772 F. Supp. at 1528 ("Under Pennsylvania law, it has been expressly stated that not all independent contractors are agents." (citing *Minds Coal*, 360 Pa. 7, 17, 60 A.2d 14, *cited with approval by Moon Area School District v. Garzony*, 522 Pa. 178, 189, n. 8, 560 A.2d 1361, 1367 n.8 (Pa. 1989))).

   A non-agent independent contractor is defined by the Restatement as:

   A person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other, is a non-agent contractor. He may be anyone who has made a contract and who is not an agent. The term is used colloquially to describe builders and others who have contracted to accomplish physical results not under the supervision of the one who has employed them to produce the results.

Restatement (Second) Agency § 14N, cmt. (b); *see AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1437-39 (3d Cir. 1994); *Montgomery Cnty. v. Microvote Corp.*, No. 97-

6331, 2000 WL 341566, at *6 (E.D. Pa. Mar. 31, 2000). A non-agency independent contractor relationship can exist where prerequisites such as control are absent. *See Kemether*, 15 F. Supp. 2d at 748.

Here, PrimeMed fails to adequately allege that the parties were in a principal/agent relationship. The facts pled by PrimeMed indicate that it did not retain any control over ClinMicro and Dr. Namdari's operation of the laboratory. (*Countercl.*, ¶¶ 69, 73-74.) PrimMed further acknowledges this point in its brief in opposition to the motion dismiss, where it notes that "[ClinMicro] and Dr. Namdari had complete control over the operation of the PrimeMed lab by virtue of their respective roles as Lab Manager and Medical Director." (Doc. 74, 20.) PrimeMed, therefore, does not allege the essential element of an agency relationship that it was "to be in control of the parties' undertaking." Pursuant to the terms of the LMA and PrimeMed's counterclaims and additional party claims, PrimeMed simply asserts that ClinMicro and Dr. Namdari were non-agent independent contractors. And, because PrimeMed does not otherwise suggest that a misappropriation of corporate opportunity claim is applicable in such circumstances, its third claim will be dismissed.

**D.     Fourth Claim- Breach of Trust/Fiduciary Duty**

PrimeMed's fourth claim asserts that ClinMicro and Dr. Namdari breached their fiduciary duties when they failed to act in PrimeMed's best interests. ClinMicro and Dr. Namdari maintain that PrimeMed fails to allege facts showing that a fiduciary duty was owed to PrimeMed. This conclusion, ClinMicro and Dr. Namdari contend, is compelled because PrimeMed has not set forth sufficient facts which would establish a principal/agent relationship. Thus, they insist that PrimeMed has not shown the existence of a fiduciary relationship between the parties. PrimeMed, in opposition, argues that a fiduciary relationship arose based on the "confidential relationship" between the parties.

Pennsylvania courts recognize three categories of relationships between contracting

parties: ordinary, arm's-length relationships; agency relationships; and confidential relationships. *Wisniski v. Brown & Brown Ins. Co.*, 906 A.2d 571, 577 (Pa. Super. Ct. 2006) (citing *Basile v. H&R Block, Inc.*, 563 Pa. 359, 761 A.2d 1115, 1120 (Pa. 2000)). As discussed in detail above, PrimeMed's counterclaims and additional party claims fail to set forth sufficient facts that the parties were in a principal/agent relationship.

Nevertheless, the third category of relationship, a confidential relationship, "can arise even in the absence of an agency relationship." *Id*. (citing *Basile*, 563 Pa. 359, 761 A.2d at 1121). "A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power." *Id*. (citing *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 23 (Pa. Super. 2002)). Under Pennsylvania law, "[i]n the business context, a confidential relationship is formed only if one party surrenders substantial control over some portion of his affairs to the other." *Devon IT, Inc. v. IBM Corp.*, 805 F. Supp. 2d 110, 129-30 (E.D. Pa. 2011) (citation and internal quotation omitted).

> Most commercial contracts for professional services involve one party relying on the other party's superior skill or expertise in providing that particular service. Indeed, if a party did not believe that the professional possessed specialized expertise worthy of trust, the contract would most likely never take place.

*eToll*, 811 A.2d at 23. This means that a fiduciary relationship does not arise simply because one party relies and pays for the specialized knowledge of the other party. *See id*. If the converse were true, a fiduciary relationship would result in all cases where one party has a marginally greater level of expertise in a particular area. *See id*. Instead, "the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side." *Id*. (quoting *Basile v. H&R Block*, 777 A.2d 95, 101 (Pa. Super. Ct. 2001)).

15

Whether a confidential relationship exists between parties is an intensely fact-specific question. *Wisniski*, 906 A.2d at 578. Thus, "[i]n assessing whether a confidential relationship exists, the Pennsylvania courts conduct a fact-intensive analysis of the relative positions of the parties." *Rossi v. Schlarbaum*, 600 F. Supp. 2d 650, 657 (E.D. Pa. 2009).

ClinMicro and Dr. Namdari's motion to dismiss the breach of fiduciary duty claim will be denied. PrimeMed alleges that ClinMicro and Dr. Namdari, in their respective positions as manager and Medical Director, were in positions of substantial control and authority over the operation of the PrimeMed laboratory. (*Countercl.*, ¶¶ 73-74.) And, under the terms of the LMA, "CIC shall provide day-to-day management services for and on behalf of PRIMEMED related to the operation of the Laboratory, including, without limitation, scheduling services and supervision of personnel, and such other services requested by PRIMEMED from time to time." (Doc. 52, Ex. 1, § 2.1.) The LMA further provides that ClinMicro and its employees "shall provide services hereunder free of any direction or control by PrimeMed." (*Id*. at § 8.1.) Based on PrimeMed's allegations and the terms of the LMA, it would be premature to dismiss the claim without reviewing the evidence and conducting a fact-intensive analysis of the positions of the parties. Although PrimeMed may well be unable to satisfy the exacting standard to establish a confidential relationship in this case, the breach of fiduciary duty claim will not be dismissed at this time.

### E.  Fifth Claim- Tortious Interference

PrimeMed also asserts a claim for tortious interference with prospective contract against ClinMicro and Dr. Namdari. To state a claim for interference with prospective contractual relations, the plaintiff must allege the following elements: "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." *Thompson*

*Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (Pa. 1979). A prospective contractual relation "is something less than a contractual right, something more than a mere hope." *Santana Prods. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 140 (3d Cir. 2005) (quoting *Thompson Coal Co.*, 412 A.2d at 471). There must be an objectively reasonable probability that a contract will come into existence. *See Schulman v. J.P. Morgan Inv. Mgt., Inc.*, 35 F.3d 799, 808 (3d Cir. 1994).

PrimeMed sufficiently pleads the necessary elements of the tortious interference with prospective contract claim. PrimeMed asserts that pricing was obtained from Quest for Vitamin D tests for referral to Quest, and that PrimeMed had the ability to refer these tests to Quest. PrimeMed further alleges that ClinMicro and Dr. Namdari intended to prevent PrimeMed's relationship with Quest from occurring once they learned that Vitamin D testing would be highly lucrative for ClinMicro. PrimeMed also adequately pleads that ClinMicro and Dr. Namdari acted without privilege or justification, and that, as a result of their conduct, PrimeMed lost significant profits and suffered increased costs.

Moreover, the claim will not be dismissed pursuant to the gist of the action doctrine. "A tortious interference with contract claim is barred by the gist of the action doctrine if it is not independent of a contract claim that is pled along with it." *Alpart v. Gen. Land Partners*, Inc., 574 F. Supp. 2d 491, 505 (E.D. Pa. 2008). At this time, it is not apparent that the tortious interference claim is dependent upon the LMA or the LSA. And, as Dr. Namdari does not appear to be a party to the LMA or the LSA, he cannot have individually breached that contract. *See, e.g., Alpart*, 574 F. Supp. 2d at 506. Since the tortious interference claim may be separate and distinct from any contract claims, PrimeMed may proceed with this claim.

**F.     Sixth Claim- Breach of Covenant of Good Faith and Fair Dealing**

In its sixth claim, PrimeMed asserts that ClinMicro breached the covenant of good

faith and fair dealing. Specifically, PrimeMed argues that ClinMicro breached the covenant of good faith implied in Pennsylvania contracts, as well as the express covenant of good faith contained in the LMA. (Doc. 52, Ex. 1, § 8.12.)

In Pennsylvania, "'in order to plead a cause of action for breach of the covenant of good faith, whether it is an express or implied covenant, a plaintiff must properly plead the elements of a claim of breach of contract.'" *Pro Acoustics, LP v. Korn*, No. 09-1076, 2010 WL 3370849, at *3 (E.D. Pa. Aug. 24, 2010) (quoting *CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co.*, 645 F. Supp. 2d 354, 369 (E.D. Pa. 2009)). To state a claim for breach of contract, Pennsylvania law requires a plaintiff to plead: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract [,] and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Because PrimeMed adequately alleges each of the elements of a breach of contract claim, PrimeMed's sixth claim will not be dismissed.[1]

## G. Seventh Claim- Unjust Enrichment

Lastly, PrimeMed asserts in the alternative an unjust enrichment claim against ClinMicro and Dr. Namdari. ClinMicro and Dr. Namdari argue, however, that an unjust

---

[1] ClinMicro and Dr. Namdari argue that by advancing a breach of contract claim, PrimeMed solidifies that its non-contract claims must be dismissed by the gist of the action doctrine. But, as discussed at length, it is unclear at this time that ClinMicro and Dr. Namdari's alleged tortious conduct arises solely from the parties contracts, that the duties breached were created and grounded in the contracts, that liability stems from the contracts, or that the tort claims essentially duplicate the contracts claim. *See Pazzo, Inc. v. Innovative Custom Brands, Inc.*, No. 09-cv-1698, 2010 WL 4365818, at *4 (M.D. Pa. Oct. 28, 2010) (expressing caution at deciding the gist of the action on a motion to dismiss and noting that "although, ultimately, the defendant may be correct that the plaintiffs cannot pursue their breach of contract claim as well as their tort claims discovery will give the parties and the court a better idea of which, if any, claims are precluded.").

enrichment claim cannot stand in this case because the parties are in agreement that express contracts, the LMA and the LSA, governed the parties' relationship.

The elements of an unjust enrichment claim "are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Braun v. Wal–Mart Stores, Inc.*, 24 A.3d 875, 896 (Pa. Super. Ct. 2011) (internal quotation marks omitted). However, "'the doctrine of unjust enrichment is inapplicable where the relationship between the parties is founded upon a written agreement or express contract.'" *Leder v. Shinfeld*, 609 F. Supp. 2d 386, 408 (E.D. Pa. 2009) (quoting *Wilson Area Sch. Dist. v. Skepton*, 586 Pa. 513, 895 A.2d 1250, 1254 (2006)).

Nevertheless, a party may plead alternative theories of breach of contract and unjust enrichment when there is a dispute about the existence or validity of the contract in question. *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 527 (E.D. Pa. 2012). The unjust enrichment claim will not be dismissed because there may be an issue as to whether an agreement exists between the parties. In fact, as I expressed at the hearing on ClinMicro's request for a preliminary injunction, the existence of an agreement remains an open question in this case. (Doc. 68, 203:11-21.) PrimeMed will be permitted to proceed on its alternative claim for unjust enrichment.

### IV. Conclusion

For the above stated reasons, ClinMicro and Dr. Namdari's motions to dismiss will be granted in part and denied in part.

An appropriate order follows.

July 17, 2013  /s/ A. Richard Caputo
Date  A. Richard Caputo
  United States District Judge