**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CLINMICRO IMMUNOLOGY CENTER,
LLC,

      Plaintiff,

          v.

PRIMEMED, P.C. and JOAN SALIJKO,

      Defendants.

--------------------------------------------------------

PRIMEMED, P.C.,

      Counterclaim and Additional-Party
      Plaintiff,

          v.

CLINMICRO IMMUNOLOGY CENTER,
LLC and HASAN NAMDARI,

      Counterclaim and Additional-Party
      Defendants.

CIVIL ACTION NO. 3:CV-11-2213

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is Defendant PrimeMed, P.C.'s ("PrimeMed") Motion for Partial Summary Judgment on Count II of Plaintiff ClinMicro Immunology Center, LLC's ("ClinMicro") Amended Complaint. (Doc. 85.)  Count II of the Amended Complaint asserts that PrimeMed breached the terms of the parties' agreement when it ceased referring Vitamin D tests to ClinMicro and began referring those tests to a third-party laboratory in 2011.  Because PrimeMed did not breach a duty owed to ClinMicro under the Reference Laboratory Services Agreement when it referred Vitamin D tests to a third-party laboratory, PrimeMed's motion for partial summary judgment will be granted.

## I. Factual Background and Procedural History

**A.     Factual Background**[1]

ClinMicro is an independent clinical microbiology and immunology center with available special expertise in the development, management, administration, and supervision of clinical reference laboratory businesses for medical providers. (*ClinMicro's Response to PrimeMed's Statement of Material Facts*, "*ClinMicro's Response,*" ¶ 1.) PrimeMed is a licensed medical provider. (*PrimeMed's Statement of Material Facts*, "*PrimeMed's SMF,*" ¶ 1.)

On or about March 1, 2009, ClinMicro and PrimeMed entered into two agreements, the Reference Laboratory Services Agreement ("LSA"), (*Am. Compl.*, Ex. C, "*LSA*"), and the Laboratory Management Agreement ("LMA"), (*Am. Compl.*, Ex. B, "*LMA*").

Under the LSA, ClinMicro desired to provide Microbiology Laboratory Services, defined by the agreement as "infectious disease diagnostic laboratory tests, molecular diagnostic laboratory tests, immunology services, and any laboratory services provided by [ClinMicro] as of the Effective Date," to PrimeMed's patients. (*LSA*, ¶ 1.2.)  Similarly, PrimeMed desired under the LSA to obtain Microbiology Laboratory Services from ClinMicro for its patients and contracted and referring providers.

With respect to the terms of the LMA, PrimeMed owned an independent clinical laboratory, and the parties thus agreed that ClinMicro would "provide day-to-day management services for and on behalf of PrimeMed related to the operation of the Laboratory, including, without limitation, scheduling services and supervision of personnel, and such other services requested by PrimeMed from time to time." (*LMA*, ¶ 2.1.) Although

---

[1]     This action involves multiple claims, counterclaims, and third-party claims. (Docs. 27; 96.)  Because the instant motion for partial summary judgment implicates only one of ClinMicro's claims, Count II of the Amended Complaint, only facts relevant to this claim are set forth herein.

the parties disputed one particular term of the LMA, the parties treated the LSA and LMA as binding agreements controlling their rights and obligations. (*PrimeMed's SMF*, ¶ 4; *ClinMicro's Response*, ¶ 4.)

According to ClinMicro, under the terms of the agreements, ClinMicro would perform microbiology tests, while PrimeMed would perform clinical chemistry tests. (*ClinMicro's Response*, ¶ 10.) After the agreements went into effect, when Vitamin D tests came into the laboratory they were directed to ClinMicro; however, tests coming in when ClinMicro was closed would be sent to other laboratories. (*PrimeMed's SMF*, ¶ 5; *ClinMicro's Response*, ¶ 5.) The parties dispute whether Vitamin D tests qualify as chemistry tests, which should have been performed by PrimeMed, or microbiology tests, which were to be performed by ClinMicro. (*PrimeMed's SMF*, ¶ 6; *ClinMicro's Response*, ¶ 6.) However, Vitamin D tests were referred to and performed by ClinMicro from the time the parties' agreements went into effect until summer 2011 (except for when ClinMicro was closed for holidays or when tests came in after ClinMicro's laboratory hours). (*PrimeMed's SMF*, ¶ 9; *ClinMicro's Response*, ¶ 9.) At that time, PrimeMed began referring Vitamin D tests to a third-party laboratory. (*PrimeMed's SMF*, ¶ 9.) Count II of the Amended Complaint asserts that PrimeMed breached the terms of the LSA when it ceased referring Vitamin D tests to ClinMicro and instead subcontracted those tests to a third-party laboratory. (*Am. Compl.*, Count II.)

**B.    Procedural History**

On November 29, 2011, ClinMicro commenced this action asserting a variety of state law and federal causes of action against PrimeMed. (Doc. 1.)  Thereafter, on August 8, 2012, ClinMicro filed an Amended Complaint. (*Am. Compl.*)  Defendants PrimeMed and Joan Salijko (collectively, "Defendants") moved to dismiss Counts VI and VII of the Amended Complaint. (Doc. 30.)  While Defendants' motion to dismiss was pending, ClinMicro, on  November 20, 2012, filed a motion for a temporary restraining order and for

a preliminary injunction. (Doc. 37.)  In particular, ClinMicro sought a temporary restraining order and preliminary injunctive relief on the bases that PrimeMed improperly attempted to terminate the LMA on September 28, 2012, and, also, that PrimeMed violated the terms of the LSA when it ceased referring all microbiology tests, *i.e.*, those tests performed by ClinMicro besides Vitamin D tests (as these referrals had already been terminated), to ClinMicro in October/November 2012.  ClinMicro further contended that PrimeMed violated the non-competition/non-solicitation provisions of the agreements. (Doc. 38.)

A hearing was held on ClinMicro's request for a preliminary injunction on November 30, 2012 and December 3, 2012.  ClinMicro's motion was denied at the conclusion of the hearing.  With respect to the irreparable harm requirement for preliminary injunctive relief, I indicated that "any harm that's been visited on ClinMicro can be redressed in damages." (Doc. 68, 202:13-15.)  And, as to ClinMicro's likelihood of success on the merits, I stated:

> [I]t's my view that I'm not satisfied that there is a likelihood of success on the merits.  These agreements, both agreements, the management agreement and the services agreement, both say they are not exclusive.  Yet, what I'm being asked to do here is to grant an injunction on the basis that they are.  It may be that they're not, it may be that they are.  I have seen nothing here and heard no argument here that convinces me that they're exclusive.  And I don't think its more likely than not that they would be found to be such.
>
> To suggest otherwise is to ignore the language of the agreement.  And it certainly wouldn't rise to the level of a likelihood of success on the merits.

(*Id*. at 202:17-203:4.)

On December 14, 2012, Defendants' motion to dismiss Counts VI and VII of the Amended Complaint was denied. (Docs. 48; 49.)

On January 9, 2013, Defendants filed their Answer to the Amended Complaint. (Doc. 52.) PrimeMed also filed counterclaims against ClinMicro and third-party claims against Dr. Hasan Namdari. (*Id*.)  ClinMicro and Dr. Namdari moved to dismiss the counterclaims and third-party claims, (Docs. 57; 58), and those motions were granted in part and denied in part. (Docs. 82; 83.)

4

Thereafter, PrimeMed filed the instant motion for partial summary judgment on Count II of the Amended Complaint. (Doc. 85.)  The motion has now been fully briefed and is ripe for disposition.

## II. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*.  Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Denal Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010).  The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient

showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).   Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57, 106 S. Ct. 2505. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)).   "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)).   In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505.

### III. Discussion

As a preliminary matter, it is necessary to address ClinMicro's contention that the record is not ripe for disposition of the motion for partial summary judgment.  Specifically,

6

ClinMicro argues that discovery had yet to commence when it filed its response to PrimeMed's motion, and, as a result, the motion for partial summary judgment is premature.

This issue is governed by Rule 56(d) of the Federal Rules of Civil Procedure, which provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).  "The rule requires 'a party seeking further discovery in response to a summary judgment motion [to] submit an affidavit specifying, for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.'" *Smith v. Depuy Orthopaedics Inc.*, - - - F. App'x - - -, 2014 WL 116288, at *3 (3d Cir. Jan. 14, 2014) (quoting *Dowling v. City of Phila.*, 855 F.2d 136, 139-40 (3d Cir. 1988)).  Furthermore, "filing an affidavit is necessary for the preservation of a Rule [56(d)] contention that summary judgment should be delayed pending further discovery." *Dowling*, 855 F.2d at 140.

Here, ClinMicro did not file an affidavit or declaration setting forth with specificity the discovery it needed to sufficiently oppose PrimeMed's motion for partial summary judgment. As such, resolution of the instant motion need not be deferred to allow for discovery because ClinMicro failed to comply with the express requirements of Rule 56(d).  Moreover, and in any event, for the reasons detailed below, additional discovery would not alter the ultimate disposition of Count II of the Amended Complaint.

As to the merits of the instant motion, PrimeMed seeks partial summary judgment on Count II of the Amended Complaint.  Count II is based on the contention that "PrimeMed breached the terms of the LSA at Section 2.1 thereof by improperly terminating the referral

7

to ClinMicro of the Vitamin D Tests and subcontracting those tests to a third party laboratory." (*Am. Compl.*, ¶ 50.) Section 2.1 of the LSA provides: "[ClinMicro] agrees to perform only outpatient reference Microbiology Laboratory Services for PrimeMed's patients as are ordered by PrimeMed or a PrimeMed Provider during the Term of this Agreement." (*LSA*, ¶ 2.1.)

PrimeMed previously sought dismissal of Count II of the Complaint, which is the same as Count II of the Amended Complaint, arguing that "[Section] 2.1 of the LSA plainly does not impose on PrimeMed any requirement to refer its Vitamin D testing" to ClinMicro. (Doc. 14, 11.) Relying solely on the language in Section 2.1 of the LSA, PrimeMed asserted that there is "no reciprocal agreement" in that section "requiring it to order such tests only from [ClinMicro]." (Doc. 24, 2.) The motion to dismiss Count II was denied.  In considering the parties' arguments as to the meaning of Section 2.1, I noted that while "Section 2.1 could be interpreted to mean that ClinMicro had an obligation to perform all services ordered by PrimeMed . . . but PrimeMed had no obligation to rely solely on ClinMicro for laboratory services," Section 2.1 could also reasonably be "interpreted as requiring PrimeMed to order all laboratory services from ClinMicro during the term of the agreement." *ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C.*, No. 11-2213, 2012 WL 3011698, at *5 (M.D. Pa. July 23, 2012).

Now, PrimeMed requests summary judgment on Count II of the Amended Complaint on the basis that Section 2.1, when read in connection with Section 3.4 of the LSA, expressly permits it to send Vitamin D tests to any laboratory.  Restated, PrimeMed argues that the LSA is not an exclusive agreement in light of Section 3.4, and, as a result, the LSA does not require Vitamin D tests to be referred to ClinMicro.  PrimeMed thus contends that, as a matter of law, it did not breach the terms of the LSA when it ceased referring Vitamin D tests to ClinMicro.  PrimeMed's motion for partial summary judgment will be granted for

the reasons explained below.

To prove a breach of contract claim under Pennsylvania law, a plaintiff "must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super. Ct. 1999)).  As indicated, PrimeMed maintains that, under the plain language of the LSA, it did not breach a duty imposed by the agreement when Vitamin D tests were referred to a third-party laboratory and not ClinMicro because the LSA does not provide for exclusivity.  PrimeMed further argues that the testimony presented at the hearing on ClinMicro's request for a preliminary injunction confirms that the LSA does not provide for the exclusive referral of Vitamin D tests (or tests generally) to ClinMicro.

In opposition, ClinMicro contends that the motion for partial summary judgment should be denied because exclusivity is required under the LSA unless Section 3.3 of the agreement is implicated.  ClinMicro also asserts that the LSA is ambiguous and parol evidence is admissible to explain or clarify or resolve the agreement's ambiguity.  And, ClinMicro notes that the LSA permits the parties to present evidence as to the intent of the parties in the event that the agreement is found to be ambiguous.[2]

The Third Circuit has explained, in detail, Pennsylvania law on contract interpretation and ambiguity:

> Pennsylvania law on contract interpretation and ambiguity is somewhat complicated; while the broad principles are clear, it is not a seamless web, and hence we will have to review some of the relevant Pennsylvania cases before applying the law to the facts at bar.  Pennsylvania contract law begins with the firmly settled point that the intent of the parties to a written contract is contained in the writing itself.  Where the intention of the parties is clear, there

---

[2]  Section 6.13 of the LSA states, in relevant part: "[i]n the event that any provision of this Agreement is found to be ambiguous, each party shall have an opportunity to present evidence as to the actual intent of the parties with respect to such ambiguous provision." (*LSA*, ¶ 6.13.)

is no need to resort to extrinsic aids or evidence, instead, the meaning of a clear and unequivocal written contract must be determined by its contents alone. Where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended. Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract.

*Bohler-Uddeholm America, Inc. v. Ernest Brock & Sons, Inc.*, 247 F.3d 79, 92-93 (3d Cir. 2001) (internal citations, quotations, and alterations omitted). A court, however, is not confined to the four corners of an agreement if its terms are unclear:

> where the contract terms are ambiguous and susceptible of more than one reasonable interpretation, the court is free to receive extrinsic evidence, *i.e.*, parol evidence, to resolve the ambiguity. But because Pennsylvania presumes that the writing conveys the parties' intent, a contract will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction. To determine whether ambiguity exists in a contract, the court may consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.

*Id*. at 93 (internal citations, quotations, and alterations omitted).

Contractual ambiguities, under Pennsylvania law, can be either patent or latent:

> a patent ambiguity appears on the face of the instrument, [while] a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous. A party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract. Lest the ambiguity inquiry degenerate into an impermissible analysis of the parties' subjective intent, such an inquiry appropriately is confined to the parties linguistic reference. The parties' expectations, standing alone, are irrelevant without any contractual hook on which to pin them.

*Id*. at 93 (internal citations, quotations, and alterations omitted).

Moreover, when a party suggests an alternative meaning to a term in an agreement, that meaning must be reasonable, and "courts must resist twisting the language of the contract beyond recognition" because "the meaning of language cannot be distorted to

establish the ambiguity." *Id*. at 93 (citation and internal quotation omitted).  And, as stated

by the *Bohler-Uddeholm* court, Pennsylvania authority on contract ambiguity establishes

that: (1) the mere disagreement between the parties as to the meaning of a term is

insufficient to establish an ambiguity; (2) each party's proffered interpretation must be

reasonable and that there must be evidence in the contract to support the interpretation

beyond the party's simple assertion of ambiguity; and (3) the proffered interpretation cannot

contradict the common understanding of the disputed term or phrase when there is another

term that the parties could easily have used to convey this contradictory meaning. *Id*. at 94-

95 (citations omitted).

> Thus,
>
> > To summarize: a contract that is unambiguous on its face must be interpreted according to the natural meaning of its terms, unless the contract contains a latent ambiguity, whereupon extrinsic evidence may be admitted to establish the correct interpretation.  However, a claim of latent ambiguity must be based on a "contractual hook": the proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face. . . . Furthermore, a proffered alternative meaning for the contractual hook must be reasonable; that is, it must be supported by contractual evidence that goes beyond the party's claim that the contractual hook has a certain meaning, and the interpretation cannot contradict the standard meaning of a term when the parties could have easily used another term to convey this contradictory meaning.  In determining whether latent ambiguity exists in a facially unambiguous contract, a court must consider whether the extrinsic evidence that the proponent of the alternative interpretation seeks to offer is the type of evidence that could support a reasonable alternative interpretation of the contract, given the foregoing principles.  Finally, a court can consider an alternative interpretation of a facially unambiguous contract term when the plain meaning interpretation of the contract would lead to an absurd and unreasonable outcome.

*Id*. at 97.

With these principles in mind, PrimeMed is entitled to summary judgment on Count

II of the Amended Complaint because the LSA is unambiguous on its face and the LSA

does not contain a latent ambiguity.  Indeed, when Section 2.1 is considered in relation to

Section 3.4, the agreement is clear: the LSA is non-exclusive with respect to the referral of

tests and services.

Section 3.4 provides:

> NO COMPENSATION FOR REFERRALS.  The amounts to be paid by PRIMEMED to [ClinMicro] hereunder have been determined by the parties through good faith and arms-length bargaining to be the fair market value of the services to be rendered hereunder.  No amount paid or to be paid hereunder is intended to be, nor shall it be construed as, an offer, inducement or payment, whether directly or indirectly, overtly or covertly, for the referral of patients by PRIMEMED to [ClinMicro], or by [ClinMicro] to PRIMEMED or for the recommending or arranging of the purchase, lease or order of any item or service.  *Each party shall be permitted to refer any individual for any item or service to any other provider or supplier of that item or service*.

(LSA, ¶ 3.4 (emphasis added).)  Both parties, under the final sentence of Section 3.4, expressly reserve the right to refer any tests or services to any provider or supplier.  Thus, the LSA does not create an exclusive arrangement between the parties, and PrimeMed was not obligated to refer Vitamin D tests to ClinMicro during the term of the LSA.  As a result, when PrimeMed ceased referring Vitamin D tests to ClinMicro and began referring those tests to a third-party laboratory, it did not breach a duty or obligation imposed by the LSA.

ClinMicro argues, however, that the LSA requires exclusivity "unless the issue of Section 3.3 was implemented." (Doc. 90, 12.)  Section 3.3 states that ClinMicro "shall not be compensated by PrimeMed for tests that are referred to another laboratory at the request of the ordering physician.  For all other tests that are performed or arranged pursuant to this Agreement, [ClinMicro] will accept the compensation terms of this Agreement." (LSA, ¶ 3.3.)  Sections 3.3 and 3.4 address referrals by entirely different individuals and entities.  Whereas Section 3.3 relates to referrals by the "ordering physician," Section 3.4, on the other hand, implicates referrals by "each party," *i.e.*, ClinMicro and PrimeMed.  Thus, Section 3.3 of the LSA does not provide support for a finding of exclusivity, nor does it address the issue of exclusivity.  Rather, as stated, exclusivity is addressed in Section 3.4 of the LSA, and that section provides for non-exclusivity based on the reservation by each party of the right to refer any test to any

provider.

ClinMicro further asserts that Section 3.4 does not apply to "Microbiology Laboratory Services," which it claims includes Vitamin D testing, because the final sentence of that section refers to "item[s] or service[s]."  ClinMicro explains that "this phrase does not include the specifically defined 'microbiology laboratory services.'  It is specifically excluded from the language. . . . When the parties intended to include Microbiology Laboratory Services, they specifically stated so in the LSA." (Doc. 90, 14.)  ClinMicro fails to account for the language in Section 3.4 providing that either party shall be permitted to refer "any" item or service to "any" other provider. (LSA, ¶ 3.4.)  Nothing in Section 3.4 limits or qualifies this language, nor is there anything in that section, or in the LSA generally, that can be read to exclude "microbiology laboratory services" from the scope of Section 3.4's ultimate sentence reserving each party the right to refer "any item or service" to "any other provider or supplier."  Accordingly, there is no ambiguity on the face of the LSA, and the LSA's unambiguous language permits PrimeMed to refer Vitamin D tests to ClinMicro or any other provider of those testing services.

Nevertheless, "when a court is faced with a contract containing facially unambiguous language, it seems that Pennsylvania law both requires that the court interpret the language without using extrinsic evidence, and allows the court to bring in extrinsic evidence to prove latent ambiguity." *Bohler-Uddeholm*, 247 F.3d at 94 (noting that Pennsylvania law contains a "built-in tension" between the principle that a contract that is not ambiguous must be interpreted on its face without reference to extrinsic evidence and the principle that contractual terms that are clear on their face can be latently ambiguous).  The Third Circuit has resolved "this tension by allowing only extrinsic evidence of a certain nature to establish latent ambiguity in a contract." *Id.*  In those cases, "a court should determine whether the type of extrinsic evidence offered could be used to support a reasonable alternative

interpretation under the precepts of Pennsylvania law on contract interpretation." *Id.* at 94 (citing *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011-14 (3d Cir. 1980)). "[T]he key inquiry in this context will likely be whether the proffered extrinsic evidence is about the parties' objectively manifested 'linguistic reference' regarding the terms of the contract, or is instead merely about their expectations.  The former is the right type of extrinsic evidence for establishing latent ambiguity under Pennsylvania law, while the latter is not." *See Bohler-Uddeholm*, 247 F.3d at 94 n.3 (citing *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995)).

Here, to the extent that ClinMicro is attempting to establish a latent ambiguity in the LSA, it offers extrinsic evidence in the form of Dr. Hasan Namdari's testimony at the preliminary injunction hearing.  According to Dr. Namdari, there were only two circumstances in which microbiology tests could be performed by a laboratory other than ClinMicro: (1) if a physician wanted the tests to be performed at a certain laboratory (as set forth in Section 3.3 of the LSA); or (2) the individual's insurance dictated that the specimen be directed to a different lab. (Doc. 67, 41:8-17.)  Besides those circumstances, Dr. Namdari testified that microbiology tests were to be referred to and performed by ClinMicro. (*Id.*)

Pennsylvania law, as explained in *Bohler-Uddeholm*, precludes consideration of the extrinsic evidence relied on by ClinMicro to demonstrate the existence of a latent ambiguity in the LSA.  ClinMicro fails to set forth a "contractual hook" for its ambiguity argument.  In this case, ClinMicro is not attempting to use extrinsic evidence to demonstrate an alternative meaning of Section 3.4.  Indeed, Dr. Namdari's testimony does not relate to "the parties' objectively manifested 'linguistic reference' regarding the terms of the contract," nor does it "support a reasonable alternative semantic reference for specific terms contained in the contract." *Bohler-Uddeholm*, 247 F.3d at 94 n.3 (citations omitted).  Instead, Dr. Namdari's

testimony, coupled with ClinMicro's arguments regarding Section 3.3, effectively read the final sentence of Section 3.4 out of the LSA.  As cautioned by the Third Circuit, however, extrinsic evidence it is not to be used to "simply support a general claim that the parties meant something other that what the contract says on its face." *Bohler-Uddeholm*, 247 F.3d at 96, 100.

Moreover, ClinMicro's proffered extrinsic evidence is "merely about [its] expectations." *Bohler-Uddeholm*, 247 F.3d at 94 n.3.  Specifically, Dr. Namdari's testimony is based on the belief that the parties were establishing an exclusive referral arrangement (except when a physician referred patients to other laboratories or an individual's insurance mandated that the specimen be sent to a specific laboratory).  But, the ambiguity inquiry is not about the expectations of the parties.  The *Bohler-Uddeholm* court emphasized that "[e]vidence regarding a party's beliefs about the general ramifications of the contract [is not] the right type to establish latent ambiguity." *Bohler-Uddeholm*, 247 F.3d at 94 n.3. Furthermore, extrinsic evidence "cannot simply show that the parties intended something different that was not incorporated into the contract." *Id*. at 93.  This extrinsic evidence addressing ClinMicro's general belief that the LSA provides for an exclusive referral arrangement without focusing on the language and terms of the LSA is not the "right type" of extrinsic evidence under Pennsylvania law. *See id*. at 94 n.3.  *Bohler-Uddeholm* therefore precludes consideration of ClinMicro's extrinsic evidence as a basis to ignore and alter the plain language of Section 3.4 of the LSA. *See id*. at 94 ("any use of extrinsic evidence to support an alternative interpretation of facially unambiguous language must be careful not to cross the 'point at which interpretation becomes alteration of the written contract.'").

Accordingly, the LSA is facially unambiguous as its clear terms are capable of only one reasonable interpretation: the LSA is a non-exclusive agreement, and, pursuant to Section 3.4, PrimeMed was permitted to refer tests to ClinMicro or any other third-party

laboratory.  Moreover, the extrinsic evidence offered by ClinMicro cannot be used to establish the existence of a latent ambiguity in the LSA.  As such, because the LSA created a non-exclusive relationship between PrimeMed and ClinMicro with respect to the referral of tests and services, PrimeMed did not breach a duty imposed by the LSA when it referred Vitamin D tests to a third-party laboratory.  PrimeMed is thus entitled to judgment as a matter of law on Count II of ClinMicro's Amended Complaint.

### IV. Conclusion

For the above stated reasons, PrimeMed's motion for partial summary judgment will be granted.

An appropriate order follows.


April 15, 2014                                      /s/ A. Richard Caputo
Date                                                    A. Richard Caputo
                                                          United States District Judge