### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CLINMICRO IMMUNOLOGY CENTER, LLC,** | : | **Civil No. 3:11-CV-2213** |
| | : | |
| **Plaintiff** | : | **(Judge Caputo)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **PRIMEMED, P.C., et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

This case involves mutual allegations of wrongdoing arising out of the dissolution of a commercial relationship between a health services provider, PrimeMed, and a laboratory employed by PrimeMed to perform various tests and manage PrimeMed's own laboratory operations, ClinMicro.  The case now comes before the Court for consideration of four separate motions for partial summary judgment filed by PrimeMed.

A reasoned assessment of these motions is complicated by the dissolution of another commercial arrangement.  The plaintiff, who initially brought this matter as a counseled complaint, has parted ways with its counsel and is representing itself, *pro se.*  Self-representation if often a perilous practice, and the perils of self-

1

representation are highlighted here, where the plaintiff's responses to these various summary judgment motions are often non-responsive, and fail to comply with the requirements set by the law, or the rules of this Court.  Notwithstanding these hurdles to an informed judgment of the parties' claims, we have reviewed these motions and for the reasons set forth below, recommend that these motions be granted, in part, and denied, in part.

## II.     Statement of Facts and Procedural History

### A.     Factual Background

The background of this acrimonious dispute is as follows:  PrimeMed is a licensed medical provider, founded in 1998, which built and staffed treatment and diagnostic centers in the Scranton area.  By 2006, PrimeMed maintained an extensive physician and health care provider network.  In the course of providing these health care services PrimeMed routinely collected blood and other samples from patients, which it referred to outside laboratories for testing and analysis.

ClinMicro was a company formed by Hasan Namdari in 2006 for the purpose of providing laboratory services, primarily in the field of microbiology and immunology.  While ClinMicro provided these laboratory testing services, it did not have infrastructure in place to collect samples from patients.  Thus, ClinMicro relied upon third-party health-care providers to forward samples to it for testing and analysis.

The defendant, Joan Salijko is a registered medical technologist with some 37 years of clinical laboratory experience.   In 2006, Ms. Salijko was hired by Dr. Namdari to serve as the laboratory manager for ClinMicro.   At the time that Ms. Salijko was hired, her employment agreement with ClinMicro was an employment-at-will arrangement.     Thus, either party was free to terminate the employment arrangement at any time.   Further, when she was first employed by ClinMicro Ms. Salijko signed confidentiality agreements, agreeing to keep ClinMicro proprietary information and patient data confidential.

Beginning in 2007 PrimeMed sought to expand its medical services to include an enhanced ability to perform laboratory testing for its patients.   As part of this effort, PrimeMed, ClinMicro and Dr. Namdari engaged in protracted negotiations which culminated in 2009 in two separate contractual arrangements between these parties:   a laboratory management agreement (LMA) and a laboratory services agreement. (LSA).

Under the laboratory services agreement:   "ClinMicro desired to provide Microbiology Laboratory Services, defined by the agreement as 'infectious disease diagnostic laboratory tests, molecular diagnostic laboratory tests, immunology services, and any laboratory services provided by [ClinMicro] as of the Effective Date,' to PrimeMed's patients.  Similarly, PrimeMed desired under the LSA to obtain Microbiology Laboratory Services from ClinMicro for its patients and contracted and

referring providers." <u>ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C.</u>, No.

3:CV-11-2213, 2014 WL 1515709, at *1 (M.D. Pa. Apr. 15, 2014).  However, by its

terms this laboratory services agreement provided that:  "*Each party shall be*

*permitted to refer any individual for any item or service to any other provider or*

*supplier of that item or service.* (LSA, ¶ 3.4 (emphasis added).)  [Therefore] [b]oth

parties, under the final sentence of Section 3.4, expressly reserve[d] the right to refer

any tests or services to any provider or supplier." <u>ClinMicro Immunology Ctr., LLC</u>

<u>v. PrimeMed, P.C.</u>, No. 3:CV-11-2213, 2014 WL 1515709, at *7 (M.D. Pa. Apr. 15,

2014).[1]

PrimeMed and ClinMicro also entered into a laboratory management

agreement, albeit an agreement whose meaning is still disputed in some respects by

the parties.  While some elements of this laboratory management agreement are

contested by the parties, PrimeMed and ClinMicro agreed in broad terms that this

laboratory management agreement provided that ClinMicro, through Dr. Namdari and

Ms. Salijko, would manage PrimeMed's fledgling laboratory operation.  In return for

an agreed-upon fee ClinMicro would staff and manage PrimeMed's lab, and would

design and build, at Prime Med's expense, a clinical laboratory for PrimeMed.

---

[1]Accordingly, relying upon this plain language of the laboratory services
agreement, this Court has held that PrimeMed did not breach the services
agreement by deciding to direct various tests to other laboratories after it became
dissatisfied with ClinMicro's services.  <u>ClinMicro Immunology Ctr., LLC v.</u>
<u>PrimeMed, P.C.</u>, No. 3:CV-11-2213, 2014 WL 1515709, at *7 (M.D. Pa. Apr. 15,
2014).

ClinMicro would also co-locate its operations with the nascent PrimeMed laboratory, subletting space in a facility leased by PrimeMed.  This laboratory management agreement also contained a non-competition provision which stated that neither party would solicit the customers or employees of the other party for a period of three years following the termination of this management contract.

While the parties seemingly agreed to these terms of their laboratory management agreement, there was a lurking dispute between them, a dispute which would later contribute to the dissolution of this agreement.  That dispute related to reimbursement to ClinMicro for any developmental expenses it incurred while helping to establish the PrimeMed lab.  For its part, PrimeMed believed that this matter was not disputed, and that the parties had agreed to pay a fixed sum of $47,500 to reimburse ClinMicro for these expenses.  Indeed, the initial written laboratory management agreement signed by PrimeMed contained these express provisions in paragraph 4.3 of the agreement.

When Dr. Namdari received this agreement, however, he deleted the original paragraph 4.3, and substituted an addendum.  That addendum gave Namdari the right to seek greater reimbursement for these developmental expenses through a process in which a mutually selected consulting firm would set the value of those services.  Namdari's alteration to this paragraph also allowed Namdari to petition the state court for an order appointing a consultant to set the value of these services.

This was plainly a very material change in the terms of the parties' agreement, but it seems to have been undertaken by the parties in an oddly elliptical fashion. Namdari altered the agreement to add this new paragraph as an addendum, and then signed both the original agreement, and the addendum and returned them to PrimeMed without further commentary. For its part, PrimeMed received this altered agreement, but did not review the agreement with care, and, therefore, did not initially note Namdari's alteration of this contractual provision at the time the signed contract was returned to it.

With the seeds of a future dispute sown in this fashion, the parties commenced their laboratory management agreement. PrimeMed's laboratory was licensed and began operations in March of 2009, with Dr. Namdari as Medical Director and Ms. Salijko as office manager. Thus, at this time Namdari and Salijko were concurrently holding similar positions in both the ClinMicro and PrimeMed laboratories. In addition, ClinMicro hired staff for the PrimeMed laboratory, staff whose salaries were paid by PrimeMed.

Almost from the outset, however, this relationship was a troubled one from PrimeMed's perspective. The source of these troubles were largely financial. Namdari and ClinMicro neglected to pay rent on the subletted space they had agreed to occupy in PrimeMed's leased laboratory space, and over time accrued back rent debts of more than $100,000. ClinMicro also failed to make timely payments on a

loan provided by PrimeMed for the purpose of purchasing laboratory equipment.  In addition, PrimeMed was dissatisfied with Namdari's supervision and oversight of the PrimeMed lab.

In October of 2010, Alan Silverman, PrimeMed's Business Manager, met with Dr. Namdari to discuss ClinMicro's failure to make these lease and loan payments, payments that PrimeMed believed were due it under the LMA and an accompanying lease agreement.  At that time, Dr. Namadri justified the failure to make these payments in part by citing PrimeMed's failure to abide by the modified developmental expense provisions of their contract, provisions which had been added to the agreement by Namdari following the receipt of a signed contract from PrimeMed with materially different developmental expense terms.  According to Mr. Silverman, this was the first that he had learned of the alteration of this term of the written agreement, and he was "furious" at what he regarded as a sharp and dishonest practice by Namdari.  For his part, Dr. Namdari seems to present a different factual narrative, suggesting that this revision was a matter discussed by the parties in advance of the alteration, although he provides sparse proof for this assertion, which is unsupported by any documentary evidence or sworn declarations.[2]

---

[2]The *pro se* plaintiff has submitted some email communications with his own counsel regarding this addendum, (Doc. 131.), as well as emails between the lawyers negotiating this agreement.  However, scrutiny of these submissions does not reveal that the last-minute alteration of this agreement was clearly disclosed by Namdari to PrimeMed.

In early 2011, the fractured relationship between PrimeMed and ClinMicro was further damaged when PrimeMed learned that a category of laboratory tests, Vitamin D tests, had been directed by Dr. Namdari from the PrimeMed laboratory to ClinMicro's labs for processing.   Dr. Namdari's referral of this category of tests to the ClinMicro laboratory was regarded by PrimeMed as a violation of the laboratory services agreement, which limited ClinMicro to microbiology testing and other categories of testing that ClinMicro certified it has performed prior to March 2009. According to PrimeMed, the Vitamin D testing was a lucrative line of business, and was chemistry testing of a type that was not performed by ClinMicro for PrimeMed prior to March 2009.  Consequently, PrimeMed viewed this practice as a surreptitious diversion of a business opportunity for the PrimeMed lab to ClinMicro, a diversion undertaken by Dr. Namdari in derogation of his duties as PrimeMed's Medical Director, and in violation of the laboratory services and management agreements.  For his part, Dr. Namdari denies these accusations, and alleges that ClinMicro was perfecting Vitamin D testing procedures in the Fall of 2008 through February 2009. (Doc. 127, p. 4.)[3]

The source of this Vitamin D testing disclosure to PrimeMed was Joan Salijko, whose duties as the lab manager for both PrimeMed and ClinMicro were becoming

---

[3]While Dr. Namdari makes this assertion he does so in a singularly unsupported fashion, asserting these factual matters in a brief, without any evidentiary support and merely alleging that documents supporting this claim will be submitted if required.  (Doc. 127, p.4.)

increasingly problematic as the relationship between these parties became increasingly fractured. Over the following months Salijko faced a series of difficult choices as this contract dissolved into mutual disagreement. Aware of the growing acrimony between Dr. Namdari and PrimeMed due to conversations she had with both parties, Salijko has attested that she reached out to PrimeMed as early as February of 2011, telling PrimeMed that, in the event of a dissolution of this working relationship she wished to remain employed by PrimeMed, rather than by ClinMicro. While Salijko has acknowledged making preparations to resign from ClinMicro and retain her employment at PrimeMed as early as February of 2011, the undisputed evidence shows that this action was initiated by Salijko. Both Salijko and PrimeMed deny that PrimeMed solicited her in any fashion to leave ClinMicro's employ.

By the summer of 2011, PrimeMed's concerns regarding ClinMicro's non-payment of rent, coupled with the disclosure of the alteration of their written laboratory management agreement and the reports that ClinMicro had diverted a lucrative line of work, the Vitamin D testing, to itself instead of to the PrimeMed lab, caused it to launch upon a course of action which led to this lawsuit. Thus, on June 13, 2011, PrimeMed notified ClinMicro that it regarded the laboratory management agreement as untenable and was terminating that agreement, effective June 15, 2011. This action, in turn, set in motion a series of events.

Within two days of PrimeMed's notification that it was terminating the laboratory management agreement, on June 15, 2011, Joan Salijko tendered her resignation from ClinMicro, effective mid-July 2011. Dr. Namdari notified the other laboratory staff that he had hired to work for PrimeMed of the dissolution of this relationship in mid-June, 2011. While there is some dispute between the parties regarding the exact nature of this notification,[4] approximately eight of the employees understood that they would lose their jobs as a result of the dissolution of this relationship between PrimeMed and ClinMicro. These employees applied for work with PrimeMed and were hired to continue to provide laboratory services to PrimeMed. Without exception, these employees deny being solicited by PrimeMed. Instead, they all agree that they sought employment with PrimeMed after being notified by Dr. Namdari that this business relationship was dissolving.

As this business relationship unwound during the summer of 2011, further points of conflict arose between the parties. One of the principal areas of dispute entailed a ClinMicro computer used by Salijko in her dual capacity as the PrimeMed and ClinMicro lab manager. This computer allegedly contained proprietary

---

[4]All of these employees have filed affidavits indicated that they sought out employment with PrimeMed, in an unsolicited fashion, after being notified by Dr. Namdari that he would be terminating their employment due to the dissolution of the PrimeMed-ClinMicro laboratory management agreement. Dr. Namdari contests these affidavits, but in a singularly unsupported manner, arguing in a brief without any supporting affidavit or declaration that he intended to employ these workers and advised them that he would agree to their transfer to PrimeMed, if PrimeMed paid him for his consent.

ClinMicro information, but also had software downloaded onto it which had been provided by PrimeMed.  As the working relationship between these two companies drew to an acrimonious close, Salijko made arrangements for PrimeMed to remove its software from the computer, and returned the computer to ClinMicro.  ClinMicro contends that during this process its own proprietary information was removed or deleted, although it has not identified any of this purloined or missing data after five years of litigation.  Salijko and PrimeMed, in turn, have filed affidavits declaring that only PrimeMed's software was removed from the computer in this process, an assertion which ClinMicro has not rebutted in any meaningful fashion.  Beyond denying any improper computer access, Salijko and officials at PrimeMed have also filed affidavits denying any disclosure, receipt, retention, use or misuse of any other proprietary information belonging to ClinMicro following the dissolution of this laboratory management agreement.  ClinMicro has not presented any countervailing evidence rebutting these declarations, or showing that confidential business information was purloined or misused by the defendants.

Finally, as this laboratory management agreement drew to a close in July 2011, PrimeMed also exercised its option under the laboratory services agreement between PrimeMed and ClinMicro to refer its laboratory work elsewhere, and began using other laboratories for this testing work.  PrimeMed then timely terminated the laboratory services agreement with ClinMicro in the following year, 2012.

11

For her part, Salijko remained employed by PrimeMed following the dissolution of this contract until 2014, when PrimeMed sold its laboratory operation to Geisinger.  Salijko is no longer employed by PrimeMed.

It is against this factual background that the parties have brought their claims, and counter-claims against one another.

### B.   Procedural History

In turning to the current array of partial summary judgment motions, we recognize that in this protracted litigation we do not write upon a blank slate.  Quite the contrary, this Court has already had occasion to address the parties' claims at length in preliminary injunction proceedings, and in rulings on various motions to dismiss and motions for partial summary judgment.  See e.g., ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C., No. CIV.A. 3:11-02213, 2012 WL 3011698, at *1 (M.D. Pa. July 23, 2012); ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C., No. 3:CV-11-2213, 2013 WL 3776264, at *1 (M.D. Pa. July 17, 2013); ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C., No. 3:CV-11-2213, 2014 WL 1515709, at *1 (M.D. Pa. Apr. 15, 2014).  Through this process the claims and counter-claims of the parties have been narrowed and focused somewhat, but an array of unresolved claims remain in this litigation.

For ClinMicro, those claims are embodied in the plaintiff's amended complaint. (Doc. 27.)  Setting aside those claims that have been dismissed by the Court in prior

proceedings, ClinMicro is still pursuing at least nine separate claims against PrimeMed and Salijko, including:   (1) a claim for breach of the laboratory management agreement between the parties, brought against PrimeMed, (Doc. 27, Count I.); (2) a claim that Salijko breached her confidentiality agreement with ClinMicro, (Doc. 27, Count III.); (3) a civil claim under the Computer Fraud and Abuse Act, 18 U.S.C. §1030, brought against both PrimeMed and Salijko (Doc. 27, Count IV.); (4) tortious interference with contract claims brought against both PrimeMed and Salijko, (Doc. 7, Counts VI and VII.); (5) a conversion claim, alleging conversion of various property and rights of ClinMicro, (Doc. 27, Count VIII.); (6) a claim for an accounting from the defendants (Doc. 27, Count IX.); (7) a civil conspiracy claim (Doc. 27, Count X.); and (8)  a demand for a declaratory judgment that Salijko may not be further employed by PrimeMed.  (Doc. 27, Count XI.)

PrimeMed has filed three motions for partial summary judgment relating to some, but not all, of ClinMicro's claims.  (Docs. 113, 116, and 118.)  Specifically, in these motions for partial summary judgment PrimeMed seeks the dismissal of Count I of the amended complaint, the breach of contract claim under the LMA, to the extent that this claim alleges that PrimeMed violated the agreement by soliciting Salijko to work for it.  In addition, the defendants seek dismissal of the claim that Salijko breached her confidentiality agreement with ClinMicro; the civil claim under the Computer Fraud and Abuse Act, 18 U.S.C. §1030, brought against both

PrimeMed and Salijko; the tortious interference with contract claims brought against both PrimeMed and Salijko; the conversion claim; the request for an accounting; the civil conspiracy claim; and the request for a declaratory judgment that Salijko may not be further employed by PrimeMed. ClinMicro's general claim of a breach of the laboratory management agreement, (Doc. 27, Count I.), appears to remain unaffected by these motions.

ClinMicro, through its owner Dr. Namdari, has filed *pro se* responses to these motions for partial summary judgment, albeit responses which are deficient in a number of respects. (Docs. 127-131.) For example, the responses do not directly address the statements of undisputed facts submitted by PrimeMed in support of these motions, something ClinMicro was required to do by Local Rule 56.1. Similarly, the responses cite no legal authority in support of the plaintiff's opposition to these motions. Instead, these responses consist largely of Dr. Namdari's unsworn assertions regarding his business dealings with PrimeMed, unsworn statements set forth as arguments in briefs in a fashion which do not satisfy the requirements of the Federal Rules of Civil Procedure.[5]

---

[5]For example, in a particularly odd twist, Dr. Namdari has refused in his briefs to respond to some of the questions presented by these motions, dismissing them as "hypothetical questions . . . I am not willing to answer." (Doc. 128, p. 10.) Dr. Namdari is wrong. These questions are not hypothetical. They are real issues presented by the lawsuit which he has elected to bring in federal court. Therefore, while Dr. Namdari may elect to ignore these questions, we cannot.

For its part, PrimeMed has responded to ClinMicro's complaint by filing an answer and counter-claim, (Doc. 52.), which brings claims of fraud, negligent misrepresentation and non-disclosure, misappropriation, breach of fiduciary duty, tortious interference, breach of the covenant of good faith, and unjust enrichment against both ClinMicro and Dr. Namdari.  In these counter-claims PrimeMed alleges that Dr. Namdari's decision to refer certain Vitamin D tests to the ClinMicro lab, instead of to PrimeMed, was an intentional, wrongful act which deprived PrimeMed of income and business opportunities.  Thus, these counter-claims have shared required elements of a wrongful act, coupled with an improper motive and intent.  As a counter-claim plaintiff, PrimeMed now has moved for a partial summary judgment as to liability on three of these claims:  breach of fiduciary duty; tortious interference, and breach of the duty of good faith and fair dealing. (Doc. 112.) This motion is also fully briefed and is ripe for resolution.

For the reasons set forth below, it is recommended that these motions be granted, in part, and denied, in part, as follows:  The defendants' motions for partial summary judgment on aspects of Count I of ClinMicro's amended complaint relating to soliciting employees in violation of a contractual non-compete agreement, and as to Counts III, IV, VI, VII, VIII, IX, X, and XI of the amended complaint, (Docs. 113, 116, and 118.) should  be GRANTED, but the motion for partial summary judgment

as to liability filed by counter-claim plaintiff PrimeMed, (Doc. 112.), should be DENIED.

### III.   <u>Discussion</u>

### A.   <u>Rule 56–The Legal Standard</u>

The defendants have moved for partial judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." <u>Univac Dental Co. v. Dentsply Int'l, Inc.</u>, No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. <u>Id.</u> at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. <u>Conoshenti v. Pub. Serv. Elec.</u>

& Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist.  Thus, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such

17

factual disputes exist.  Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995).  Similarly, it is well-settled that:  "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F.App'x 896, 899 (3d Cir. 2007)(citation omitted).  Indeed, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. Of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)."  [A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, a party who seeks to resist a summary judgment motion must also comply with Local Rule 56.1, which specifically directs a party opposing a motion for summary judgment to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the

18

nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1.  Under the Local Rules, the failure to follow these instructions  and appropriately challenge the material facts tendered by the defendant means that those facts must be deemed, since:

> A failure to file a counter-statement equates to an admission of all the facts set forth in the movant's statement.  This Local Rule serves several purposes.  First, it is designed to aid the Court in its determination of whether any genuine issue of material fact is in dispute.  Second, it affixes the burden imposed by Federal Rule of Civil Procedure 56(e), as recognized in Celotex Corp. v. Catrett, on the nonmoving party 'to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, *designated specific facts showing that there is a genuine issue for trial*.' 477 U.S. 317, 324 (1986) (internal quotations omitted) (emphasis added).

Doe v. Winter, No. 04-CV-2170, 2007 U.S. Dist. LEXIS 25517, *2 n.2 (M.D. Pa. Apr. 5, 2007) (parallel citations omitted; court's emphasis).  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant.  These rules apply with equal force to all parties.  See Sanders v. Beard, No. 09-CV-1384, 2010 U.S. Dist. LEXIS, *15 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 U.S. Dist. LEXIS 64347, *11 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

Judged against these benchmarks, and noting the failure of Dr. Namdari and ClinMicro to support or sustain a number of the claims which they have alleged, it is recommended that these motions be granted, in part, and denied, in part, as described in greater detail below.

### B.   The Motions For Partial Summary Judgment Filed By Defendants PrimeMed and Salijko Seeking Summary Judgment on Some of the Plaintiff's Claims Should Be Granted

### 1.   ClinMicro's Declaratory Judgment Claim is Now Moot

In our view, a number of ClinMicro's claims and causes of action fail as a matter of law at the current stage of these proceedings given the plaintiff's failure to legally or factually support those claims.  For example, to the extent that ClinMirco initially sought a declaratory judgment from this Court prohibiting Joan Salijko from continuing to work for PrimeMed, events have overtaken that claim, which is now moot.  Specifically, PrimeMed sold its laboratory operations to Geisinger in 2014, while this case was pending, and no longer employs Salijko in any capacity.

These intervening events now render this request for declaratory relief moot. The mootness doctrine recognizes a fundamental truth in litigation:   "[i]f developments occur during the course of  adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 698-99 (3d Cir. 1996).  In contractual employment and workplace

litigation, courts have long recognized that developments in the course of litigation may render a claim for declaratory judgment moot since:  "[t]he Declaratory Judgments Act sets as a prerequisite to declaratory relief that a 'case of actual controversy' exist between the parties."  Korvettes, Inc. v. Brous, 617 F.2d 1021, 1023 (3d Cir. 1980).

So it is in this case with respect to ClinMicro's request for a declaratory judgment that Salijko may not continue to work for PrimeMed.  Salijko no longer is employed by PrimeMed and there currently seems to be no foreseeable prospect for re-employment of Salijko by PrimeMed since PrimeMed has sold its laboratory operations to Geisinger.  On these facts, there no longer is a live controversy between these parties relating to Salijko's on-going employment by PrimeMed, and Count XI of ClinMicro's amended complaint which sought a declaratory judgment on this issue should be dismissed.

**2.** **ClinMicro's Civil Claim Under the Computer Fraud and Abuse Act, 18 U.S.C. §1030, Fails as a Matter of Law**

Likewise, Count IV of ClinMicro's amended complaint, which alleges a civil claim under the Computer Fraud and Abuse Act, (CFAA), 18 U.S.C. §1030, fails as a matter of law on the undisputed facts currently before the Court.  A civil claim under this statute entails proof of the following "four elements:  (1) defendant has accessed a 'protected computer;' (2) has done so without authorization or by

exceeding such authorization as was granted; (3) has done so 'knowingly' and with 'intent to defraud'; and (4) as a result has 'further[ed] the intended fraud and obtain[ed] anything of value.'" P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC., 428 F.3d 504, 508 (3d Cir. 2005).

Under the CFAA, only unauthorized access to a computer is forbidden; that is, access done without authorization or access which exceeds any authorization. This element of a CFAA claim has particular pertinence here, since it is undisputed that Salijko's access to ClinMicro's computers took place while she was a ClinMicro employee, and at a time when her position as laboratory manager gave her full computer access to the ClinMicro computer system. In this type of workplace setting, this Court has held that "an employee granted access to a computer in connection with his [or her] employment is 'authorized' to access that computer under the CFAA regardless of his or her intent or whether internal policies limit the employee's use of the information accessed. See Dresser–Rand, 957 F.Supp.2d at 615 (citing WEC Carolina Energy Solutions, 687 F.3d at 205–06; United States v. Nosal, 676 F.3d 854, 857–59 (9th Cir.2012) (en banc ); LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1132–35 (9th Cir.2009))" Advanced Fluid Sys., Inc. v. Huber, 28 F. Supp. 3d 306, 328 (M.D. Pa. 2014). Dresser-Rand Co. v. Jones, 957 F. Supp. 2d 610, 611 (E.D. Pa. 2013). Therefore, ClinMicro's CFAA claims, which are premised entirely upon computer access by Salijko within the scope of her authorized access while employed

by ClinMicro , simply do not constitute the type of unauthorized access forbidden by the statute.

Furthermore, in order to state a civil claim under CFAA a plaintiff must show an economic loss which exceeds $5,000 caused by the improper and unauthorized access.  See Brooks v. AM Resorts, LLC, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013). Despite having been afforded ample opportunity over the past five years to develop proof of this element of a CFAA claim, ClinMicro has produced no such evidence of a loss in the requisite amount that was caused by any wrongful computer access by Salijko.  Therefore, ClinMicro has failed to establish this element of a CFAA claim as well.

Moreover, to the extent that ClinMicro seeks to hold PrimeMed responsible for any computer access violations committed by Salijko, on some sort of aiding and abetting theory of liability, this claim also founders on a single, simple obstacle. "The CFAA does not create a cause of action for aiding and abetting. See Flynn v. Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP, No. 3:09–CV–00422, 2011 WL 2847712, at *2–4, 2011 U.S. Dist. LEXIS 77217, at *7–9 (D.Nev. July 15, 2011)"  Advanced Fluid Sys., Inc. v. Huber, 28 F. Supp. 3d 306, 328 (M.D. Pa. 2014).

Finally, this particular claim runs afoul of the fact that there simply is no evidence adduced by ClinMicro to support its claim of any form of improper

computer access causing injury, and Salijko has specifically denied that any improper

activity took place.  At this juncture, ClinMicro and Dr. Namdari cannot "expect to

rely merely upon bare assertions, conclusory allegations or suspicions," <u>Gans v.</u>

<u>Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985)(citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519

(3d Cir. 1981)), to sustain this claim in the face of a well-documented summary

judgment motion filed by the defendants.  The plaintiff must produce proof sufficient

to create a genuine issue of material fact regarding this claim.  Here, the plaintiff has

failed to make such a showing, and that failure is fatal to this claim.

### 3.     ClinMicro Has Not Shown That Salijko Breached Her Confidentiality Agreement or Converted Confidential Trade Information

Likewise Count III of the plaintiff's amended complaint, which alleges a

breach of Salijko's confidentiality agreement with ClinMicro fails on similar grounds.

While it is undisputed that Salijko entered into a confidentiality agreement with

ClinMicro when she joined that company, ClinMicro simply has presented no

evidence in response to the motion for partial summary judgment to suggest that

Salijko breached that agreement by receiving, retaining, using or misusing

confidential information belonging to the plaintiff.  Quite the contrary, the only

evidence on this score that is before the Court are the denials of Salijko and

PrimeMed officials that any disclosure of ClinMicro's confidential business

information ever occurred.

Similarly, ClinMicro's conversion claim set forth in Count VIII of its amended complaint rests upon the assertion that confidential business information and trade secrets were stolen by the defendants.  As this Court previously noted:  "[u]nder Pennsylvania law, 'conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification.' Stevenson v. Econ. Bank of Ambridge, 413 Pa. 442, 197 A.2d 721, 726 (1964) (internal quotation marks omitted).  Pennsylvania recognizes a claim for conversion of business information.  See Pierre & Carlo, Inc. v. Premier Salons, Inc., 713 F.Supp.2d 471, 481 (E.D.Pa.2010).  'To state a claim for conversion of business information, a party must allege the acquisition of confidential business information through misconduct.'  Bancorp Bank v. Isaacs, No. 07–1907, 2010 WL 1141336, at *9 (E.D.Pa. Mar.25, 2010)."  ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C., No. CIV.A. 3:11-02213, 2012 WL 3011698, at *8 (M.D. Pa. July 23, 2012).

Yet, while ClinMicro's allegations of conversion were sufficient to withstand a motion to dismiss, at the summary judgment stage of proceedings more is required of this plaintiff.  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v.

Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.  Anderson, 477 U.S. at 249.

In this case, after five years of litigation, ClinMicro simply has not pointed to any competent evidence showing that the defendants purloined confidential business information.  Where, as here, there is a complete failure of proof on this essential element of a conversion or breach of confidentiality claim; namely, the misuse of confidential information, summary judgment is entirely appropriate.  See Imaginative Research Associates, Inc. v. Ramirez, 718 F. Supp. 2d 236, 251 (D. Conn. 2010)(granting summary judgment where there was no evidence of misuse of confidential information).  While ClinMicro persists in surmising in the absence of any evidence that some form of improper disclosure of confidential information must have occurred, it is well settled that "speculation and conjecture is insufficient to defeat [a] motion for summary judgment."  Kovalev v. City of Philadelphia, 362 F. App'x 330, 331 (3d Cir. 2010).  Since ClinMicro attempts to substitute its conjecture for concrete evidence on this issue, the plaintiff has not carried its burden of proof and persuasion at this stage of the proceedings, and the defendants are entitled to summary judgment on these claims.

**4.**     **The Defendants Are Entitled to Summary Judgment on the Various Tortious Interference and Employee Solicitation Claims Brought by ClinMicro**

In Counts I, VI and VII of its amended complaint, ClinMicro brings a series of related contract and tortious interference claims, alleging that PrimeMed and Salijko breached the laboratory management agreement non-compete provision and tortious interfered with ClinMicro's business relations when: (1) PrimeMed hired Salijko and other employees to staff its lab following the termination of the laboratory management agreement between PrimeMed and ClinMicro; (2) PrimeMed continued to provide laboratory services to its pre-existing clients, whose needs had been met for a time by ClinMicro; and (3) when Salijko notified PrimeMed that Dr. Namdari was directing Vitamin D tests to his own company ClinMicro instead of referring that work to PrimeMed.

None of these claims can survive summary judgment on the current sparse factual record amassed by the plaintiff. Indeed, these claims fail on a number of separate and independent scores. First, to the extent that ClinMicro is alleging that PrimeMed tortiously interfered with its at-will employment contracts with Salijko and her fellow co-workers, this claim may well fail as a matter of law since at-will employment contracts by their very nature may be terminated at any time and, therefore, are often considered not to be subject to tortious interference. Indeed, several judges of this Court, construing Pennsylvania law in this regard have

expressly held that the "current state of Pennsylvania law does not allow tortious interference claims based on at-will employment contracts." Mifflinburg Tel., Inc. v. Criswell, 80 F. Supp. 3d 566, 572 (M.D. Pa. 2015), citing Ransom v. Carbondale Area Sch. Dist., 982 F. Supp. 2d 397 (M.D. Pa. 2013).

Beyond this threshold legal flaw in ClinMicro's claim there is a second, fundamental failure of proof. Any tortious interference claim, or breach of the non-compete provision of the LMA claim, brought against PrimeMed must be premised on the notion that PrimeMed solicited Salijko and the other workers, since the agreement between these parties only forbids solicitation of each other's employees. Yet, ClinMicro presents no evidence of solicitation of these former employees by PrimeMed. Instead, without exception, Salijko and her co-workers have attested that they were not solicited by PrimeMed. Rather, they uniformly state that they reached out to PrimeMed to seek employment with PrimeMed as the laboratory management agreement dissolved in the summer of 2011. This fact, which appears to be undisputed and uncontested in the record, wholly undermines any tort or contract claim which rests upon an allegation that PrimeMed improperly solicited these ClinMicro employees. On this score, it is axiomatic that " '[t]o be held liable for interference with a contract, the defendant must be shown to have caused the interference....'" Stolp v. Sollas Corp., No. CIV. A. 96-0723, 1997 WL 83750, at *4 (E.D. Pa. Feb. 21, 1997). See Credit Card Sales Supplies Corp. v. Spectrum Metals

<u>Inc.</u>, No. 03-CV-5906, 2004 WL 3158537, at *10 (E.D. Pa. Jan. 31, 2004)(granting summary judgment where there was no evidence that defendants interfered with the employment contract).  Here, the essential element of causation is wholly lacking since the uncontradicted statements of all of the employees is that PrimeMed did not solicit them; rather, they reached out to PrimeMed seeking employment with that company.

Similarly, ClinMicro's claims that PrimeMed tortiously interfered with its contracts with other laboratory service clients runs afoul of a series of insurmountable legal obstacles.  First, the only "clients" identified by ClinMicro with respect to this claim are clients who had contracts with PrimeMed, and not ClinMicro.  This fact completely undermines any tortious interference claim since under Pennsylvania law "a corporation's agents or employees generally cannot, as a matter of law, tortiously interfere with the corporation's own contracts."  <u>Whaumbush v. City of Philadelphia</u>, 747 F. Supp. 2d 505, 513 (E.D. Pa. 2010).  ClinMicro attempts to overcome this obstacle by arguing some novel sort of joint-venture theory.  Thus, ClinMicro seems to acknowledge that these clients only had contracts with PrimeMed but asserts that once PrimeMed and ClinMicro entered into the laboratory management agreement they effectively became joint venturers and PrimeMed's clients automatically became clients of ClinMicro as well.

There are at least three problems with this argument which combine to defeat this claim.  First, the plain language of the laboratory management agreement itself flatly states that PrimeMed and ClinMicro are not engaging in a joint venture. Therefore, to adopt ClinMicro's position we would have to ignore the very language of the agreement between these two companies.  This we cannot do.  Second, this claim is inconsistent with the language of the laboratory services agreement between these parties.  We have previously construed this services agreement as a non-exclusive services contract which allowed PrimeMed to decline to refer any laboratory work to ClinMicro.  See ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C., No. 3:CV-11-2213, 2014 WL 1515709, at *7 (M.D. Pa. Apr. 15, 2014).  Given this interpretation of the laboratory services agreement, which allowed PrimeMed to completely decline to use ClinMicro's services, it cannot be said that PrimeMed somehow committed a tort when it followed a course that the parties had specifically agreed to by contract, and declined to refer work to ClinMicro.  Finally, this argument by ClinMicro fails because in the context of the business dealings of these parties it is commercially irrational.  As we previously noted, the non-compete provision of the laboratory management agreement applied for 3 years following the termination of the agreement itself.  If we adopted ClinMicro's interpretation of the agreement, and held that PrimeMed's clients automatically became clients of ClinMicro as well, then the practical effect of the non-compete provision in this agreement would be to ban

PrimeMed from independently working with its own prior customers to provide those customers laboratory services from anyone other than ClinMicro for a 3 year period. No rational corporate actor would unilaterally forbid itself from servicing its own customers for years.

It is a basic tenet of contract interpretation that a party's interpretation of contract language must be commercially reasonable.  See e.g., Glenn Distributors Corp. V. Carlisle Plastics, Inc. 297 F.3d 294, 301 (3d Cir. 2002); County of Mercer v. Unilect Corp., 612 F.Supp.2d. 638, 649 (W.D. Pa. 2009)(collecting cases).  Since the interpretation of this non-compete provision urged upon us by ClinMicro is commercially irrational we will decline to construe the agreement in the fashion urged by the plaintiff.  Instead, consistent with the commercially reasonable interpretation of these contracts, and given the undisputed fact before us, we recommend that ClinMicro's tortious interference claims based upon PrimeMed's alleged interference with its own customers' contracts be denied.

Finally, ClinMicro has brought a tortious interference claim against defendant Salijko.  As alleged in Count VII of the plaintiff's amended complaint, the gist of this tortious interference claim is that Salijko wrongfully shared information with PrimeMed when she responded to questions by PrimeMed regarding the diversion of Vitamin D testing by Dr. Namdari and reported to PrimeMed that Dr. Namdari was, in fact, referring those highly lucrative tests to his own business, ClinMicro, instead

31

of directing those tests to the PrimeMed lab.  At the time of this conduct Salijko was

employed in a dual capacity by both PrimeMed and ClinMicro.  Thus, the conduct

which ClinMicro alleges was tortious consisted of an employee responding to an

inquiry from one of her employers.  Furthermore, it is entirely undisputed that the

information which Salijko provided to PrimeMed was accurate.  Dr. Namdari was, in

fact, referring a number of these tests to his wholly owned business, instead of

directing them to the PrimeMed laboratory.  ClinMicro contends, however, that

Salijko's conduct of accurately reporting facts to her employer was somehow wanton

and willful since it later led PrimeMed to curtail its business dealings with ClinMicro.

On these facts, we conclude that this tortious interference claim fails as a

matter of law.  Indeed, the plaintiff's claim invites us to embrace a novel and legally

unsupported proposition.  In order to sustain this tortious interference claim we would

have to hold that when a employee honestly answers questions posed by her

employer, she can be held civilly liable if the employer later acts upon that

information to the financial detriment of some other actor.  This we cannot do.

In our view this tortious interference claim fails on several scores.  "In order

to prevail on a claim for interference with contractual relations, the plaintiff must

plead and prove four elements:  (1) the existence of a contractual relation; (2) the

defendant's purpose or intent to harm the plaintiff by preventing the relation from

occurring; (3) the absence of any privilege or justification on the part of the

defendant; and (4) damages resulting from the defendant's conduct." Brown & Brown, Inc. v. Cola, 745 F. Supp. 2d 588, 621 (E.D. Pa. 2010). "The presence of a privilege is not an affirmative defense, rather, the absence of such a privilege is an element of the cause of action which must be pleaded and proven by the plaintiff. Capecci v. Liberty Corp., 406 Pa. 197, 202, 176 A.2d 664 (1962); Barlow v. Brunswick Corporation, 311 F.Supp. 209 (E.D.Pa.1970)." Bahleda v. Hankison Corp., 228 Pa. Super. 153, 156, 323 A.2d 121, 122 23 (1974).

In this case, at the time of this alleged tortious conduct, Salijko was an employee of both PrimeMed and ClinMicro. As a PrimeMed employee, Salijko owed a duty of candor to her employer. Therefore, she was obliged to truthfully answer questions posed to her by PrimeMed officials, including questions concerning how Dr. Namdari was allocating Vitamin D tests between these two firms. Indeed, if Salijko has chosen expedience over candor and misled PrimeMed she could have been subject to discharge and civil liability for her lack of candor to her employer. Presented with this Hobson's Choice, a dilemma created by Prime Med and ClinMicro, who had both chosen to employ Salijko even as their interests began to diverge, Salijko chose the path of truth, and accurately reported that Dr. Namdari had referred Vitamin D testing to his own firm, ClinMicro.

Accurately reporting facts to your own employer is expected and required in the workplace. Therefore, this is privileged conduct, and ClinMicro's tortious

interference claim fails since ClinMicro has not pleaded or proven that this conduct by Salijko was not privileged.  Furthermore, as we have noted  " '[t]o be held liable for interference with a contract, the defendant must be shown to have caused the interference....'"  Stolp v. Sollas Corp., No. CIV. A. 96-0723, 1997 WL 83750, at *4 (E.D. Pa. Feb. 21, 1997).  See Credit Card Sales Supplies Corp. v. Spectrum Metals Inc., No. 03-CV-5906, 2004 WL 3158537, at *10 (E.D. Pa. Jan. 31, 2004)(granting summary judgment where there was no evidence that defendants interfered with the employment contract).  In this case, there simply is no evidence that Salijko caused any interference with ClinMicro's business relations with PrimeMed.  She simply reported facts to PrimeMed, facts which later contributed to an independent decision by PrimeMed to discontinue this business relationship.  Since there is no evidence that Salijko made this decision, she cannot be viewed as the causal agent in this matter, and ClinMicro's tortious interference claim fails both on privilege and causation grounds.

### 5.    ClinMicro Is Not Entitled to an Accounting

In Count IX of its amended complaint ClinMicro seeks a form of equitable relief from this Court, an accounting of PrimeMed's assets, profits and revenues. (Doc. 27, Count IX.)  ClinMicro has not made the showing necessary to justify this relief.  "[U]nder Pennsylvania law:  'An equitable accounting is improper where no fiduciary relationship exists between the parties, no fraud or misrepresentation is

34

alleged, the accounts are not mutual or complicated, or the plaintiff possesses an adequate remedy at law.   Buczek v. First National Bank of Mifflintown, 366 Pa.Super. 551, 531 A.2d 1122, 1124 (Pa.Super. 19 87) (citing Ebbert v. Plymouth Oil Company, 348 Pa. 129, 34 A.2d 493 (1943)**;** Shaw v. Newingham, 279 Pa. 180, 123 A. 783 (1924)**;** Graham v. Cummings, 208 Pa. 516, 532, 57 A. 943, 949 (1904)**).'** Rock v. Pyle, 720 A.2d 137, 142 (Pa.Super.Ct.1998)." Grill v. Aversa, No. 1:12-CV-120, 2014 WL 4672461, at *10 (M.D. Pa. Sept. 18, 2014).   Furthermore, "[e]quitable jurisdiction for an accounting does not exist merely because the plaintiff desires information that he could obtain through discovery."   Buczek v. First Nat. Bank of Mifflintown, 366 Pa. Super. 551, 556, 531 A.2d 1122, 1124 (1987).

In the instant case, over the past five years ClinMicro has availed itself of numerous legal remedies in its contest and dispute with PrimeMed.   Some of these remedies, in the form of breach of contract claims, still survive.   Therefore, it is apparent that the plaintiff possesses an adequate remedy at law, a factor which militates against any equitable accounting.   Moreover, it also seems clear that the purpose of this accounting would be to support the plaintiff's damages claims.   Since this information could have been obtained in the ordinary course of discovery it is not properly the subject of a free-standing claim for an accounting since  jurisdiction for an accounting does not exist merely because the plaintiff desires information that he

could obtain through discovery.  Accordingly, this accounting claim should also be

dismissed.

> **6.      ClinMicro's Civil Conspiracy Claim Fails as a Matter of Law**

Finally, in Count X of the amended complaint, the ClinMicro alleges a civil

conspiracy claim involving PrimeMed and its employee, Salijko, who are alleged to

have conspired against ClinMicro.  As pleaded, and in light of the failure of proof on

ClinMicro's substantive tort claims, this civil conspiracy allegation also fails to state

a claim upon which relief may be granted.  Under Pennsylvania law there are three

essential elements to a civil conspiracy claim.  To plead and prove such a claim a

plaintiff must allege that:  (1) two or more persons acted with a common purpose to

commit an illegal act or to commit a lawful act by unlawful means or for an unlawful

purpose, (2) overt action in furtherance of the common purpose has been taken and

(3) actual legal damage has resulted.  <u>Weaver v. Franklin County</u>, 918 A.2d 194,202

(2007) (citing <u>Brown v. Blaine</u>, 833 A.2d 1166 (2003)).  Moreover:

> [I]n order to plead a civil . . .  action based upon a claim of conspiracy,
> a plaintiff must plead allegations that are:
>
>> supported by facts bearing out the existence of the
>> conspiracy and indicating its broad objectives and the role
>> each defendant allegedly played in carrying out those
>> objectives.  Bare conclusory allegations of "conspiracy" or
>> "concerted action" will not suffice to allege a conspiracy.
>> The plaintiff must expressly allege an agreement or make
>> averments of communication, consultation, cooperation, or
>> command  from which such an agreement can be inferred.

36

Flanagan v. Shively, 783 F.Supp. 922, 928 (M.D.Pa.1992).  Furthermore, when pleading a conspiracy claim, a plaintiff cannot rely upon subjective suspicion and speculation.  Young v. Kann, 926 F.2d 1396, 1405 n. 16 (3d Cir.1991).  Quite the contrary, "to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred.  D.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1377 (3d Cir.1992); see also Startzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir.2008) (stating that a conspiracy requires a 'meeting of the minds') (further citation omitted).  This holding remains good law following Twombly and Iqbal, which, in the conspiracy context, require 'enough factual matter (taken as true) to suggest that an agreement was made,' in other words, 'plausible grounds to infer an agreement.'  Twombly, 550 U.S. at 556, 127 S.Ct. 1955, 167 L.Ed.2d 929."  Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 178 (3d Cir.2010) cert. denied, —— U.S. ——, 131 S.Ct. 1798, 179 L.Ed.2d 655 (U.S.2011).  We are mindful of these pleading requirements, which are considered together with the standards of pleading applicable to all civil actions in federal court as defined in Twombly and Iqbal, supra.

Victor v. Huber, No. 3:12-CV-282, 2012 WL 7463723, at *14 (M.D. Pa. Nov. 29, 2012) report and recommendation adopted sub nom. Victor v. Hubbard, No. 3:12-CV-00282, 2013 WL 704654 (M.D. Pa. Feb. 26, 2013).

Here the ClinMicro's civil conspiracy allegations fail to meet these basic requisites for a valid civil conspiracy cause of action for at least three reasons.

First, "Pennsylvania law mandates that 'absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act.' Goldstein v. Phillip Morris, Inc., 854 A.2d 585, 590 (Pa.Super.Ct.2004) (quoting McKeeman v. Corestates Bank, 751 A.2d 655, 660 (Pa.Super.Ct.2000)).  A plaintiff charging civil conspiracy must, therefore, 'plead or develop a[ ] separate underlying

intentional or criminal act that can support a civil conspiracy claim.' Id." Accurso v.
Infra-Red Servs., Inc., 23 F. Supp. 3d 494, 512 (E.D. Pa. 2014).  Here, we have found
that the ClinMicro's substantive tort claims fail as a matter of law on multiple scores.
Since the plaintiff's amended complaint, as currently written, fails to sufficiently
"plead or develop a[ ] separate underlying intentional or criminal act that can support
a civil conspiracy claim," it follows that this conspiracy claim also fails as a legal
matter.

Second, the plaintiff's conspiracy claim involves what is alleged to have been
a conspiracy between a company, PrimeMed and one of its employees, Joan Salijko.
Yet, it is well-settled under Pennsylvania law that "[a] single entity cannot conspire
with itself and, similarly, agents of a single entity cannot conspire among
themselves." Grose v. Procter & Gamble Paper Products, 2005 PA Super 8, ¶ 7, 866
A.2d 437, 441 (2005); Irish v. Farley, No. 483 EDA 2014, 2015 WL 7573607, at *11
(Pa. Super. Ct. Feb. 3, 2015); Agarwal v. Schuylkill Cty. Tax Claim Bureau, No.
3:CV 09 1921, 2010 WL 5175126, at *6 (M.D. Pa. Aug. 13, 2010), report and
recommendation adopted sub nom. Agarwal v. Schuykill Cty. Tax Claim Bureau, No.
3:09 CV 1921, 2010 WL 5175003 (M.D. Pa. Dec. 15, 2010), aff'd sub nom.
Agarwal v. Schuylkill Cty. Tax Claim Bureau, 442 F. App'x 733 (3d Cir. 2011); Lilly
v. Boots & Saddle Riding Club, No. 57 C.D. 2009, 2009 WL 9101459, at *6 (Pa.
Commw. Ct. July 17, 2009).  Given that a company and its agents cannot conspire,

this conspiracy count, which names a company, PrimeMed, and one of its employees, Salijko, as defendants fail to satisfy an essential element of any civil conspiracy, the requirement that *two or more persons* act with a common purpose to commit an illegal act or to commit a lawful act by unlawful means or for an unlawful purpose. Weaver v. Franklin County, 918 A.2d 194,202 (2007).

Finally, this conspiracy claim, which is set forth in conclusory terms, fails as a matter of pleading since:  "[b]are conclusory allegations of 'conspiracy' or 'concerted action' will not suffice to allege a conspiracy [and] [t]he plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred." Flanagan v. Shively, 783 F.Supp. 922, 928 (M.D.Pa.1992).  Therefore, both as a matter of pleading and proof, ClinMicro cannot sustain this conspiracy claim, and it should be dismissed.

> ### C.     Disputed Issues of Fact Preclude Partial Summary Judgment in Favor of Counter-Claim Plaintiff PrimeMed on its Breach of Fiduciary Duty, Tortious Interference, and Breach of the Duty of Good Faith Claims

In addition to seeking partial summary judgment on some of the claims leveled against it, PrimeMed as a counter-claim plaintiff has moved for a partial summary judgment in its favor with respect to ClinMicro's liability  on three of these claims: breach of fiduciary duty; tortious interference, and breach of the duty of good faith and fair dealing.  In these counter-claims PrimeMed alleges that Dr. Namdari's

decision to refer certain Vitamin D tests to the ClinMicro lab, instead of to PrimeMed, was an intentional, wrongful act which deprived PrimeMed of income and business opportunities.   Thus, these counter-claims share required elements of a wrongful act, coupled with an improper motive and intent.

An intentional, wrongful act is an essential element to each of these claims. Thus, a tortious interference with prospective contracts claim requires proof of the purpose or intent to harm the plaintiff by a defendant.   Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 208, 412 A.2d 466, 471 (1979).   Likewise, implicit in any claim of a breach of good faith is the assertion that a party has acted in bad faith. Therefore, proof of a bad motive or intent is an essential element of such a claim. Further, the breach of fiduciary duty claim lodged by PrimeMed in its counter-claim against ClinMicro and Dr. Namdari clearly alleges an intentional derogation of this fiduciary responsibility.   Thus, all three of these claims share this common element of intentional misconduct.

With these legal claims framed by PrimeMed in this fashion, we find that Dr. Namdari's *pro se* response to this motion, while inartful, when liberally construed admits to the conduct alleged, but denies on a number of grounds that Dr. Namdari acted with a wrongful intent.   Instead, Dr. Namdari contends that his actions were permitted, or justified, by the agreements of the parties.   While PrimeMed insists with great force that Dr. Namdari's claims of good faith are unpersuasive, at this stage,

where we are considering a motion for summary judgment on these claims, we are constrained to note that it is well-settled that: "The motive or absence of motive of a party to engage in conduct alleged by another party is relevant to determining whether a genuine issue of fact exists. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 596 (1986)." Berda v. CBS Inc., 800 F.Supp. 1272, 1276 (W.D.Pa), aff'd., 975 F.2d 1548 (3d Cir. 1992). "Further, it is emphatically not the province of the court to weigh evidence, or assess credibility, when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the Court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)." Robinson v. Marsh, No. 3:11-CV-1376, 2015 WL 11017976, at *4 (M.D. Pa. Feb. 2, 2015), report and recommendation adopted, No. 3:11-CV-1376, 2015 WL 11018838 (M.D. Pa. Feb. 25, 2015).

With the scope of our review cabined in this fashion, and liberally construing the filings of Dr. Namdari as a *pro se* litigant, we find that Dr. Namdari's defense to these claims entails an assessment of his motive and intent, a disputed issue which in turn calls for an evaluation of Dr. Namdari's credibility, a task which should not be undertaken in a summary judgment motion. Therefore, it is recommended that

PrimeMed's motion for partial summary judgment as to liability on these counter-claims be denied.

## IV.   <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendants' motions for partial summary judgment should be GRANTED in part, and DENIED, in part, as follows:

1.     The defendants' motions for partial summary judgment on aspects of Count I of ClinMicro's amended complaint relating to soliciting employees in violation of a contractual non-compete agreement, and on Counts III, IV, VI, VII, VIII, IX, X, and XI of the amended complaint, (Docs. 113, 116, and 118.) should be GRANTED,

2.     The motion for partial summary judgment as to liability filed by counter-claim plaintiff PrimeMed, (Doc. 112.), should be DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may

accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 7th day of July 2016.

**_S/Martin C.  Carlson_**
Martin C. Carlson
United States Magistrate Judge